**Victor Wayne HOOKS, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–89–555.**

Court of Criminal Appeals of Oklahoma.

Sept. 7, 1993.

Order Denying Rehearing Oct. 5, 1993.

Ronald F. Evans, Oklahoma City, Trial Counsel for appellant.

Robert G. Boren and Patrick H. Lavelle, Oklahoma City, Appellate Counsel for appellant.

Richard Vallejo, Oklahoma City, appellate counsel for appellant.

Robert H. Macy, Oklahoma County Dist. Atty., Fern Smith, Asst. Dist. Atty., Oklahoma City, trial counsel for appellee.

Robert H. Henry, Atty. Gen. of Okla., A. Diane Hammons, Asst. Atty. Gen., Oklahoma City, appellate counsel for appellee.

## OPINION

CHAPEL, Judge:

Victor Wayne Hooks was tried by jury and convicted of First Degree Malice Aforethought Murder for the death of Shalimein Blaine (21 O.S.Supp.1982, § 701.7) (Count I), and First Degree Manslaughter (21 O.S.1981, § 713) (Count II) for the death of a viable fetus, in Oklahoma County District Court, Case No. CRF–88–5642, before the Honorable Jack R. Parr, District Judge. The jury found three aggravating circumstances and set Hooks' punishment at death for Count I and five hundred (500) years imprisonment for Count II. We affirm.

At approximately 7:00 p.m. on October 6, 1988, Hooks went to the home of Virginia Plumley. He told Ms. Plumley her daughter, twenty-one year old Shalimein Blaine, had been beaten and raped and needed to go to the hospital. When Ms. Plumley asked him what had happened, he claimed he did not know. Hooks then left Ms. Plumley's residence and returned to Shalimein's apartment less than a block away.

When Ms. Plumley, accompanied by her daughter Amanda, reached Shalimein's apartment, Hooks was loading Shalimein, who was unconscious and clad only in a blanket, into a car. During the drive to the hospital, Hooks told them Shalimein had gone for a walk, returned, knocked on the apartment door, and then collapsed into his arms when he opened the door. Ms. Plumley noticed Shalimein's head had been partially shaved, her face was extremely swollen and her arms and legs were covered with bruises.

Dr. Greg Johnson, an emergency room physician at St. Anthony's Hospital, testified Shalimein Blaine was clinically dead when she reached the hospital. Through "heroic efforts" physicians were able to reestablish a heartbeat and pulse. Dr. Johnson testified Shalimein Blaine was pregnant. An ultrasound, performed shortly after Ms. Blaine arrived at the hospital, revealed the unborn child was dead. Testimony at trial indicated the fetus was of twenty-four weeks gestation. A blunt force had ruptured the liver of the fetus. Additionally, the fetus sustained bruises to its abdomen and head. According to testimony, the fetus was alive at the time its mother received the injuries to her abdomen, and apart from the injuries, the fetus was viable. Ms. Blaine was pronounced dead at 9:16 a.m. the following morning.

Oklahoma City Police Officer Robert Ardle was dispatched to St. Anthony's Hospital to conduct a preliminary investigation on a reported sexual assault. Hooks related essentially the same story to Officer Ardle that he earlier told Ms. Plumley: Shalimein left the apartment on foot at approximately 4:15 p.m. and returned at around 7:15 p.m., collapsing in his arms after he answered her knock at the door. He told the officer he carried Shalimein into the bathroom, placed her in the bathtub and then went to Ms. Plumley's house for help.

While at the hospital, Hooks signed a search waiver authorizing officers to search Shalimein's apartment. Officers entered Shalimein's apartment and found some hair in a trash can. In addition, blood was discovered on the bed, on the carpet near the bed and on several wash cloths and towels in a clothes hamper. When the officers next searched a trash dumpster near the apartment, they found several bloody wash cloths and a large clump of hair.

Detectives Eric Mullenix and Randy Scott questioned Hooks at the Oklahoma City Police Station at approximately 1:00 a.m. on October 7, 1988. Detective Mulle-

nix read him the *Miranda* rights and Hooks agreed to speak with the detectives. Hooks said he and Shalimein had lived together for four years and that they had a one-year old child and Shalimein was pregnant with his second child. He again claimed Shalimein had left the apartment on foot at around four p.m. and fallen into his arms after he answered the door. According to Hooks, he then left the apartment to get Ms. Plumley. When he returned, Shalimein was in the bathtub. He picked her up, wrapped her in a blanket and took her to the hospital.

Detective Mullenix was aware bloody clothing, wash cloths, and a large amount of hair had been found in the dumpster near the apartment. When asked to explain the presence of these items, Hooks began to cry and told officers he wished to tell the truth. He admitted he and Shalimein had fought. He claimed Shalimein had slapped him and he had struck her with his fist and kicked her. After striking Shalimein, Hooks removed her clothes and placed her in the bathtub. He then cleaned up the apartment, placing the bloody articles into the dumpster before going to Ms. Plumley's home. He claimed he had shaved Shalimein's head looking for injuries.

## ISSUES RELATING TO JURY SELECTION

In his seventh proposition, Hooks contends the trial court erred in excusing for cause Venirepersons Coney, Hood, Russell and Wallace because of their concern about the death penalty. Prospective Jurors Hood, Russell and Wallace clearly and unequivocally stated they did not believe in capital punishment and could not assess a penalty of death. The trial court asked prospective Juror Coney whether, if selected as a juror in a case where the law and evidence would warrant the death penalty, he could recommend such a sentence "without doing violence to [his] conscience,...." Ms. Coney responded, "[b]ecause of my religion I could not." Upon further questioning by the trial court, Venireperson Coney stated "maybe under some circum-

stances, maybe" she could consider the death penalty. Finally, Ms. Coney stated she did not know whether she could consider a capital sentence.

The proper inquiry when deciding whether to excuse a potential juror for his or her views on capital punishment is whether those views would prevent or substantially impair the juror's ability to perform their duties in accordance with the instructions and oath. *Wainwright v. Witt,* 469 U.S. 412, 420, 105 S.Ct. 844, 850, 83 L.Ed.2d 841 (1985). A potential juror's bias need not be shown with "unmistakable clarity," and in reviewing such claims great deference will be given to the trial judge who sees and hears the juror. *Id.* at 424, 105 S.Ct. at 853. These principles clearly support the trial court's decision to excuse Venirepersons Hood, Russell, and Wallace. Although prospective Juror Coney's answers were somewhat conflicting, the record supports the conclusion that her views on capital punishment would have prevented or substantially impaired the performance of her duties as a juror. Therefore, we conclude the trial court properly excluded all four potential jurors. *See Thomas v. State,* 811 P.2d 1337, 1352 (Okl.Cr.1991), *cert. denied,* — U.S. —, 112 S.Ct. 895, 116 L.Ed.2d 798 (1992); *Sellers v. State,* 809 P.2d 676, 683 (Okl.Cr.), *cert. denied,* — U.S. —, 112 S.Ct. 310, 116 L.Ed.2d 252 (1991); *Rojem v. State,* 753 P.2d 359, 363 (Okl.Cr.), *cert. denied,* 488 U.S. 900, 109 S.Ct. 249, 102 L.Ed.2d 238 (1988).

## ISSUES RELATING TO GUILT– INNOCENCE

In his third assignment of error, Hooks contends the trial court erred in refusing to allow Doctors Murphy and King to testify during the first stage of trial. The doctors are clinical psychologists and each had conducted psychological evaluations of Hooks prior to trial. According to Hooks' brief, the doctors' testimony was offered to show that he could not have acted with malice aforethought when killing Shalimein Blaine. In an offer of proof, Dr. Murphy said it was his opinion that

Hooks did not act with malice aforethought when he killed the victim. Dr. Murphy further testified Hooks had been in a delusional state and had acted in the heat of passion. Dr. King had no opinion concerning Hooks' mental state at the time of the crimes, but stated he did not demonstrate any present sign of mental illness. Dr. King said Hooks had poor impulse control and a very violent potential.

The trial court, in ruling the testimony of these experts inadmissible, stated: "This testimony by [Dr. Murphy] and Dr. King goes to impulse control and whether [Hooks] acted compulsively and whether he would overreact under certain stress, none of which are any defense to the crime of having kicked and stomped a woman to death." The trial court excluded the proffered testimony as being "a clear-cut invasion of the province of the jury."

Before the adoption of the Evidence Code in 1978, "Oklahoma had long recognized the common law rule that expert opinion evidence regarding the ultimate fact for the jury's consideration was generally not admissible." *Gabus v. Harvey*, 678 P.2d 253, 255 (Okl.1984). *See also Marr v. State*, 741 P.2d 884, 886 (Okl.Cr. 1987). Since the enactment of the Code, "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." 12 O.S.1981, § 2704 (Emphasis added). This Court has held that the " 'otherwise admissible' language means that Section 2704 must be read together with Sections 2701–2703 and 2403 of the Oklahoma Evidence Code." *McCarty v. State*, 765 P.2d 1215, 1218 (Okl.Cr.1988). *See also Marr, supra* at 886. Under section 2702, expert opinion testimony should be admitted only if it will "assist the trier of fact to understand the evidence or to determine a fact in issue...." Section 2403 provides for the exclusion of relevant evidence if its probative value "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, needless presentation of cumulative evidence, or unfair and harmful surprise."

In other words, "[a]lthough Section 2704 abolished the 'ultimate issue' rule, Sections 2701, 2703, and 2403 should operate to bar admission ' "of opinions which would merely tell the jury what result to reach...." ' " *Moore v. State*, 788 P.2d 387, 399 (Okl.Cr.), *cert. denied*, 498 U.S. 881, 111 S.Ct. 227, 112 L.Ed.2d 182 (1990), *quoting* 1 L. Whinery, *Guide to the Oklahoma Evidence Code* 243, 254 (1985).

Dr. Murphy performed a psychological evaluation of Hooks in April of 1989 and determined he was not then psychotic. However, after reviewing some of Hooks' previous Eastern State Hospital records which reflected that he had experienced some psychotic episodes, and subjecting Hooks to various psychological tests accepted by the medical community as reliable, Dr. Murphy concluded he did not act with malice aforethought when committing the murder because he was probably "in a state of catatonic excitement and he wasn't completely competent at that time." Dr. King also performed a standard competency evaluation on Hooks. She concluded from her findings that Hooks had a "very violent potential." Dr. King would not speculate as to Hooks' mental condition at the time of the murder, except to say she found no signs of mental illness.

Both doctors' testimony significantly omitted an assessment of Hooks' sanity, i.e., whether, at the time of the murder, he had the mental capacity to distinguish right from wrong or to understand the nature and consequences of his acts. *See Nauni v. State*, 670 P.2d 126, 132 (Okl.Cr.1983). Dr. Murphy testified Hooks was probably not in touch with reality when he murdered Ms. Blaine, but did not say whether Hooks could have distinguished right from wrong or appreciated the nature and consequences of his acts. Dr. King testified Hooks has a "tendency not to pay attention to consequences but just impulsively to act." Choosing to ignore consequences is clearly different from being incapable of understanding those consequences.

Had defense counsel believed insanity was a viable defense, he should have properly raised it prior to trial. *See* 22

O.S.Supp.1985, § 1176. Because a jury might need assistance in understanding and assessing mental disorders which would render an accused insane, expert testimony is routinely admitted when the defense of insanity is raised. When, as in this case, a defendant attempts to elicit expert testimony on the issue of whether he or she possessed the requisite intent to commit the crime in question, such testimony should be excluded. Here, as in *Gabus, supra*, "[n]o special knowledge was needed to understand these facts and draw conclusions from them." *Id.*, 678 P.2d at 256. Anyone who has ever witnessed a temper tantrum or a fight, felt an urge to strike out at another person or attempted to explain away a bad deed could have appreciated the nature of Hooks' actions before, during and after the murder: "[W]here the normal experiences and qualifications of laymen jurors permit them to draw proper conclusions from the facts and circumstances, expert conclusions or opinions are inadmissible." *Id. See also Bechtel v. State*, 840 P.2d 1, 8 (Okl.Cr.1992). The proffered testimony of Drs. King and Murphy was properly excluded under sections 2702 and 2704 of the Evidence Code.

■ In his fourth proposition of error, Hooks claims the trial court erred in refusing to allow certain testimony of Scott Cannon during the first stage of trial. Mr. Cannon, a deputy with the Oklahoma County Sheriff's Department, transported Hooks from the city jail to the place he was to be arraigned. Deputy Cannon testified that prior to their departure from the city jail, Hooks asked what he was being charged with. The deputy told him he was charged with first degree murder. Hooks then began beating his head on a table and shouting "No, no, no." Deputy Cannon, with the help of several jail personnel, placed him in handcuffs and leg irons. Deputy Cannon testified that after this struggle, Hooks told Cannon that "I went off on her." The prosecution objected when defense counsel asked Deputy Cannon if appellant made any other state-

ments. In an offer of proof, defense counsel stated the following:

That if Mr. Cannon were asked, Did he make any other statements to you, Mr. Cannon would testify that Mr. Hooks began saying that he did not mean to kill her. He stated that they were arguing when she slapped him. He stated that he just lost it. He stated that he had been very depressed and lost it. He stated he took her to the hospital because she was bleeding.

The trial court ruled such testimony was inadmissible hearsay.

At trial, Hooks argued the testimony should have been admitted under the excited utterance and/or the state of mind exceptions. *See* 12 O.S.1981, § 2803(2), & (3), respectively. On appeal, he abandons these arguments and contends the testimony was admissible under section 2804(B)(1) of the Evidence Code, which provides:

B. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

1. Testimony given as a witness at another hearing of the same or another proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered or, in a civil action or proceeding, a predecessor in interest had an opportunity and similar motive to develop the testimony by direct, cross or redirect examination; ....

(Emphasis added). Hooks argues he was "unavailable" for purposes of this section because he implicitly exercised his Fifth Amendment privilege against self-incrimination and refused to testify at trial. *See* 12 O.S.1981, § 2804(A)(1). *See also Funkhouser v. State*, 734 P.2d 815, 816–17 (Okl.Cr.1987), *cert. denied*, 484 U.S. 942, 108 S.Ct. 326, 98 L.Ed.2d 354.[1]

We need not address whether Hooks, who sought admission of his own out-of-court statement at his trial during which he claimed the Fifth Amendment privilege,

1. Unlike the defendant in *Funkhouser*, Hooks did not specifically state that his decision not to testify was based upon his Fifth Amendment privilege.

was "unavailable" as a witness for purposes of section 2804(A)(1). *See United States v. Evans,* 635 F.2d 1124, 1126, n. 1 (4th Cir.1980), *cert. denied,* 452 U.S. 943, 101 S.Ct. 3090, 69 L.Ed.2d 958 (1981). Whether or not Hooks was unavailable, the out of court statements he wanted to place before the jury through the testimony of Deputy Canon did not constitute "[t]estimony given as a witness at another hearing or the same or another proceeding" as required by section 2804(B)(1). Rather, they were self-serving statements Hooks made to Deputy Canon inside the city jail prior to arraignment. We conclude the trial court properly excluded the proffered testimony as inadmissible hearsay.

■ In his fifth assignment of error, Hooks contends the trial court erred in refusing to instruct the jury on the offenses of first degree manslaughter and second degree murder. We have consistently held a defendant is entitled to an instruction on a lesser included offense only when the evidence presented warrants such an instruction. *Hale v. State,* 750 P.2d 130, 136 (Okl.Cr.), *cert. denied,* 488 U.S. 878, 109 S.Ct. 195, 102 L.Ed.2d 164 (1988); *Foster v. State,* 714 P.2d 1031, 1039 (Okl.Cr.), *cert. denied,* 479 U.S. 873, 107 S.Ct. 249, 93 L.Ed.2d 173 (1986). Furthermore, it is the duty of the trial court to determine as a matter of law whether the evidence presented at trial is sufficient to justify the submission to the jury of instructions on lesser included offenses. *Williams v. State,* 807 P.2d 271, 275 (Okl. Cr.1991).

■ Hooks points to no evidence in the record supporting the requested instructions. Rather, he asserts the transcript is devoid of any evidence of premeditation, and that, had the proffered testimony of Drs. Murphy and King been admitted, the evidence would have shown him incapable of forming malice aforethought. We have already established the trial court properly excluded the testimony of the two doctors. Further, Hooks' argument that the record does not support premeditation ignores several firmly entrenched legal concepts. First, "[a] design to effect death [i.e., pre-meditation] is inferred from the fact of killing, unless the circumstances raise a reasonable doubt whether such design existed." 21 O.S.1981, § 702. Second, premeditation sufficient to constitute murder may be formed in an instant. *Boyd v. State,* 839 P.2d 1363, 1367 (Okl.Cr.1992). Finally, malice aforethought may be proved by circumstantial evidence. *Cavazos v. State,* 779 P.2d 987, 989 (Okl.Cr.1989).

■ The testimony introduced by the State tended to show the victim was the target of a sustained and relentless attack. Dr. Jordan, a pathologist, said the victim "received multiple blunt force injuries to the head, chest, arms, back, abdomen, [and] vagina." Dr. Jordan listed the cause of death as "multiple injuries." The evidence, albeit circumstantial, was sufficient to prove Hooks, at some point during the attack, formulated the intent to kill Ms. Blaine. In the absence of any competent evidence supporting either first degree manslaughter or second degree murder, we find no error in the trial court's refusal to so instruct.

In his sixth assignment of error, Hooks contends the trial court erred in admitting State's Exhibit No. 25 over defense counsel's objection. State's Exhibit No. 25 is a photograph depicting the facial and head injuries sustained by Ms. Blaine. Hooks contends this photograph should have been excluded because it is gruesome, its probative value is exceeded by the danger of unfair prejudice, and it is cumulative to State's Exhibits 26, 27, and 29. We disagree.

■ The test for admissibility of a photograph is not whether it is gruesome or inflammatory, but whether its probative value is substantially outweighed by the danger of unfair prejudice. *Clayton v. State,* 840 P.2d 18 (Okl.Cr.1992). Whether to introduce photographs of a homicide victim is a decision largely within the trial court's discretion. *Bennett v. State,* 652 P.2d 1237, 1239 (Okl.Cr.1982). Although State's Exhibit 25 showed the victim while she was attached to various lifesaving medical devices, we find the photograph was

properly admitted because it corroborated the testimony concerning both the victim's shaved head and her numerous facial injuries. *See Grayson v. State*, 747 P.2d 971, 974 (Okl.Cr.1987).[2]

▇▇ Additionally, the admission of three other photographs did not render State's Exhibit 25 needlessly cumulative. State's Exhibits 26, 27 and 29 were photographs of the victim's face taken after medical personnel had cleaned the body. None of these photos captured to the same extent as No. 25 the vast amount of swelling that accompanied the victim's injuries.

▇▇ Finally, we reject Hooks' argument that State's Exhibit 25 was inadmissible because neither the identity of the victim nor the fact she was beaten were matters contested at trial. We rejected a similar argument in *Williamson v. State*, 812 P.2d 384, 400 (Okl.Cr.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1592, 118 L.Ed.2d 308 (1992), and are not persuaded to hold otherwise here. Photographs depicting murder victims can be probative in many respects. They can show the nature, extent and location of wounds, establish the corpus delicti, depict the crime scene and corroborate a medical examiner's testimony. *Nguyen v. State*, 769 P.2d 167, 171 (Okl.Cr.1988), *cert. denied*, 492 U.S. 925, 109 S.Ct. 3264, 106 L.Ed.2d 609 (1989). In addition to the aforementioned examples, the photographs, which showed the wide ranging locations of the victim's wounds, were relevant to the jury's determination of malice aforethought. This assignment is denied.

## ISSUES RELATING TO PUNISHMENT

In support of its request that the death penalty be imposed, the State alleged the existence of three aggravating circumstances in reference to Count I: (1) the defendant was previously convicted of a felony involving the use or threat of violence to the person; (2) the murder of Shalimein Blaine was especially heinous, atrocious or cruel; and (3) the probability existed that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. *See* 21 O.S.1981, § 701.12(1), (4), & (7), respectively. The jury found each of these aggravating circumstances existed.

▇▇ During the trial's penalty phase, the prosecution called Mr. Buck Ray. In February, 1982, while working as a police officer, Mr. Ray investigated a robbery of a liquor store. Mr. Ray testified the store employee sustained a hand cut during the course of the robbery and that he found a large knife at the scene. Mr. Ray identified Hooks as the person who committed the robbery. Additionally, the prosecution introduced a Judgment and Sentence which reflected Hooks had been convicted of robbery with a dangerous weapon on August 6, 1982. After moving to incorporate all first stage evidence into the second stage, the State rested.

In his first proposition of error, Hooks, without citing any authority, claims the sentence of death was imposed under the influence of passion, prejudice, and arbitrary factors. Nothing in the record indicates that the jury was influenced in its decision to assess the death penalty by passion, prejudice, or factors contrary to 21

---

2. Apparently, State's Exhibit No. 25 captured the victim's face after some inflatable packing had been placed inside her mouth and nose area. Arguably, the photo was prejudicial and inflammatory because it inaccurately depicted the victim's face as more swollen than it actually was. *See Harless v. State*, 759 P.2d 225, 227 (Okl.Cr. 1988). However, there was testimony by Dr. Greg Johnston—the emergency room physician on duty when Shalimein Blaine was brought to the hospital—that a quart of blood was eventually suctioned from the victim's face. This large amount of blood, which collected as a result of the victim's injuries, could have caused her face to swell. Further, Dr. Fred Jordan, then Chief Medical Examiner for the State of Oklahoma, testified that the victim's face "was markedly swollen ... [and] just very, very distorted ... due to injuries that she had had inflicted about her head." Tr. 319. He further testified the victim had bitten her tongue, and there was a lot of swelling inside her mouth and bruising inside her lips. Accordingly, we find the medical procedures performed on the victim did not distort her actual injuries, and that those injuries were accurately depicted in State's Exhibit No. 25.

O.S.Supp.1987, § 701.13(C)(1). Most of the arguments advanced in this assignment of error are reasserted, in a more specific fashion, in later propositions and will be addressed there. Because Hooks has failed to cite authority, arguments appearing only in this proposition do not warrant independent discussion and shall not be addressed. *VanWoundenberg v. State,* 720 P.2d 328, 335 (Okl.Cr.), *cert. denied,* 479 U.S. 956, 107 S.Ct. 447, 93 L.Ed.2d 395 (1986).

In his second assignment of error, Hooks questions the sufficiency of the evidence introduced to prove the aggravating circumstances. His arguments in this area are neither detailed nor supported by authority. Despite the lack of authority to support this proposition, we have, consistent with our statutory duty, reviewed the evidence introduced in support of the aggravating circumstances alleged. We find the testimony of Buck Ray, in conjunction with the evidence of Hooks' conviction for robbery with a dangerous weapon, sufficient to support the jury's finding that he was previously convicted of a felony involving the use or threat of violence.

Next, Hooks claims the evidence was insufficient to support the jury's conclusion that the murder of Shalimein Blaine was especially heinous, atrocious or cruel. Again, we disagree. In *Stouffer v. State,* 742 P.2d 562, 563 (Okl.Cr.1987) (Opinion on Rehearing), *cert. denied,* 484 U.S. 1036, 108 S.Ct. 763, 98 L.Ed.2d 779 (1988), we held that the heinous, atrocious or cruel aggravating circumstance requires a showing that torture or serious physical abuse preceded the victim's murder. Examined in isolation, the testimony of the pathologist, Dr. Jordan, supports Hooks' argument. Dr. Jordan testified Ms. Blaine suffered a mid-brain contusion that rendered her unconscious, but he could not determine the order in which she received the injuries. Thus, Dr. Jordan was unable to render an opinion concerning whether Ms. Blaine was conscious during the attack.

However, Hooks' statements to police indicate Ms. Blaine was conscious during the beating. At trial, Detective Eric Mullenix testified as follows:

He [appellant] said that he then struck her with his fist and that she fell on to the floor by the bed. He said that he then kicked her in the stomach and then in the face. He said that they were— that she laid there on the floor by the bed, and that she began to bleed, with blood coming out of her mouth and nose.

He said that she then told him that she was hurt and that he picked her up off the floor and took her into the bathroom and put her in the bathtub. He then removed her clothing and began trying to clean her up and put all of her clothing into the trash can in the kitchen.

He said that she then became unconscious and that he continued to tell her to wake up....

Additionally, David Faske, who lived across the hall from Ms. Blaine at the time of the incident, testified that on the evening of October 6, 1988, he heard thumping noises coming from her apartment from about 5:00 p.m. until 7:00 p.m. Based on the above, a rational trier of fact could reasonably conclude that Ms. Blaine was conscious during at least some portion of the attack and that she suffered the requisite torture or serious physical abuse. Accordingly, we find this evidence sufficient to support the jury's determination that the murder of Shalimein Blaine was especially heinous, atrocious or cruel.

Next, Hooks claims there was insufficient evidence to support the "continuing threat" aggravating circumstance. Specifically, he asserts that "[o]ne conviction does not make a person a continuing threat." This assertion is at odds with this Court's holding that the nature and circumstances of the killing itself are sufficient to show a propensity toward future acts of violence. *Fowler v. State,* 779 P.2d 580, 588 (Okl.Cr.1989), *cert. denied,* 494 U.S. 1060, 110 S.Ct. 1537, 108 L.Ed.2d 775 (1990). For no apparent reason, Hooks beat and stomped a young woman to death, causing the death of an unborn child in the process. We find the callous and brutal nature of the killing, along with proof of

his prior violent felony conviction, sufficient to support the jury's finding of this aggravating circumstance. *See Fisher v. State*, 736 P.2d 1003, 1009 (Okl.Cr.1987), *cert. denied*, 486 U.S. 1061, 108 S.Ct. 2833, 100 L.Ed.2d 933 (1988). This assignment of error is denied.

## ISSUES RELATING TO EFFECTIVE ASSISTANCE OF COUNSEL

In his eighth assignment of error, Hooks contends that defense counsel was ineffective because Hooks was not allowed to testify during either the first or second stage of trial. However, the record does not support Hooks' assertion that defense counsel "did not allow" appellant to testify. At the conclusion of the prosecution's case in the first stage of the trial, defense counsel questioned Hooks in chambers concerning his right to testify:

MR. EVANS: (defense counsel): You understand you have a right to testify in your own behalf?

THE DEFENDANT: Yeah. I mean yes.

MR. EVANS: You understand that if you did testify, you would be subject—as I explained to you, you would be subjected to cross examination by Mr. Macy or Miss Smith. They have a right to ask you some questions on cross examination. Do you understand that?

THE DEFENDANT: Yes.

MR. EVANS: You understand that we have discussed the possibility that the judge might rule that your robbery conviction could be used to impeach your credibility, that the jury might be able to hear about that. We discussed that, did we not?

THE DEFENDANT: Yes we, did.

MR. EVANS: And do you think you understand your rights, as far as they go, as far as testifying or not testifying in your own behalf?

THE DEFENDANT: Yes, I understand my rights.

MR. EVANS: What is your wish at this time, Victor, in regard to testifying?

THE DEFENDANT: Not to testify.

MR. EVANS: Are you sure that's your wish?

THE DEFENDANT: Yes.

To prevail on an ineffective assistance claim, Hooks must demonstrate counsel's performance was deficient and such deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). To demonstrate prejudice, he must show a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* at 696, 104 S.Ct. at 2068. In addition, if it is easier to dispose of an ineffectiveness claim on the lack of sufficient prejudice, that course should be followed. *Id.* at 696, 104 S.Ct. at 2069.

Whether a defendant will testify on his own behalf at a criminal trial is a decision properly left to the accused. *See* Rule 1.2(a) of the *Rules of Professional Conduct*, 5 O.S.Supp.1988, Ch. 1, App. 3–A. Assuming Hooks was influenced by defense counsel's advice, which may have suggested that he not testify, such advice is a matter of trial strategy and will not be considered ineffective assistance of counsel. *See Camron v. State*, 829 P.2d 47, 54 (Okl.Cr.1992). Hooks has failed to establish defense counsel's performance was deficient. Even if we were to assume that defense counsel's performance was deficient, he has failed to demonstrate any possibility that, but for counsel's errors, the result of the trial would have been different. This assignment of error is denied.

## MANDATORY SENTENCE REVIEW

Pursuant to 21 O.S.Supp.1987, § 701.13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor and (2) whether the evidence supports the jury's finding of an aggravating circumstance as enumerated in 21 O.S.Supp.1981, § 701.12. After reviewing the record in this case, it is clear that the jury's imposition of the death penalty against Hooks was based upon proper-

ly admitted testimony and evidence. The callous nature of this crime, Hooks' admission that he committed it, and the fact that he carefully and deliberately attempted to remove all evidence of this deed and blame it on someone else provided the jury with a sound basis for imposing a sentence of death. Nothing in the record indicates the jury's decision was the product of passion, prejudice or any other arbitrary factor.

Supporting the three aggravating circumstances was extensive and overwhelming evidence that Hooks, with little or no provocation, brutally beat and stomped to death a young woman who was six months pregnant with his child. The beating lasted approximately two hours. While the pathologist could not conclude with certainty that the victim was conscious during the assault, Hooks' stated in his confession she told him at one point during the beating she was hurt. The unborn fetus also suffered fatal injuries to the head and liver as a result of the attack. Further, Hooks had a prior violent felony conviction which was adequately proven at trial.

The mitigating factors the jury was bound to consider were set forth in Instruction No. 8: Hooks was twenty-seven years old at the time he committed the subject offenses; he had a family that loved and cared about him; he was under stress at the time of the offenses; he had an eighteen month old child; he had a condition which made him susceptible to stress; he expressed remorse for his actions; his I.Q. was 80; he had a psychic disorder which caused him to lose touch with reality; he had previously been hospitalized for mental problems; and he had a mental condition which affected his ability to resist aggressive impulses. After careful review and consideration of the evidence supporting the three aggravating circumstances, as well as the mitigating evidence presented, we find the sentence of death factually substantiated and appropriate.

For the foregoing reasons the Judgment and Sentence is **AFFIRMED.**

LUMPKIN, P.J., and JOHNSON, V.P.J., concur.

LANE, J., concurs in result.

LANE, Judge, concurring in result.

I disagree with the majority in the treatment of State's Exhibit Number 25. In footnote 2, the majority concedes that arguably medical procedures exaggerated the features of the victim's face. In addition, the exhibit depicts life saving medical equipment in the form of large tubes inserted in the victim's mouth. This contributed to the prejudicial value of the photograph. Since other pictures demonstrated the victims injuries, I believe Exhibit 25 should not have been admitted, and the testimony of the medical personnel does not cure the error.

However, I find that in light of the overwhelming evidence presented at trial the error was not determinative of the outcome and further find that is not so prejudicial as to cause reversal.

### ORDER DENYING PETITION FOR REHEARING

Victor Wayne Hooks was tried by a jury and convicted of First Degree Malice Aforethought Murder (Count I) and First Degree Manslaughter (Count II) in Oklahoma County District Court, Case No. CRF–88–5642, before the Honorable Jack R. Parr, District Judge. The jury found the existence of three aggravating circumstances and the judge, in accordance with the jury's recommendation, sentenced Hooks to death on Count I and five hundred years imprisonment on Count II.

By published opinion handed down on September 6, 1993, this Court affirmed Hooks' convictions on both counts. Hooks is now before the Court on a Petition for Rehearing, which is governed by Rule 3.14, *Rules of the Court of Criminal Appeals,* 22 O.S.Supp. 1993, Ch. 18, App. According to Rule 3.14, a Petition for Rehearing shall not be filed as a matter of course, but only for two reasons:

(1) That some question decisive of the case and duly submitted by the attorney

of record has been overlooked by the Court, or

(2) That the decision is in conflict with an express statute or controlling decision to which the attention of this Court was not called either in the brief or in oral argument.

Hooks raises two propositions in his Petition for Rehearing. Neither meets the criteria set forth in Rule 3.14. Accordingly, these propositions will not be addressed.

**IT IS THEREFORE THE ORDER OF THE COURT** that the Petition for Rehearing filed herein be **DENIED.**

**IT IS SO ORDERED.**

/s/Charles A. Johnson
CHARLES A. JOHNSON, Vice Presiding Judge

/s/James F. Lane
JAMES F. LANE, Judge

/s/Charles S. Chapel
CHARLES S. CHAPEL, Judge

/s/Reta M. Strubhar
RETA M. STRUBHAR, Judge