Treva Lanan **HUGHES,** Appellant,

v.

The **STATE** of **Oklahoma,** Appellee.

No. F–92–1083.

Court of Criminal Appeals of Oklahoma.

Jan. 24, 1994.

Bill Pipkin, Moore, for appellant.

Evan Gatewood, Asst. Dist. Atty., Oklahoma City, for State.

Susan B. Loving, Atty. Gen., Jennifer Miller, Asst. Atty. Gen., Oklahoma City, for appellee.

## OPINION

CHAPEL, Judge:

On August 2, 1990, Appellant, Treva LaNan Hughes, while intoxicated, drove her vehicle into oncoming traffic and collided with another vehicle. The driver of the other vehicle, Reesa Poole, was nine months pregnant and expected to deliver in four days. The collision caused Poole's stomach to hit the steering wheel of her car with such force that the steering wheel broke. Poole was taken to a hospital where an emergency cesarean section was performed. When the baby was delivered, the only sign of life was an extremely slow heartbeat. A pediatrician immediately began resuscitation efforts, which were unsuccessful.

After a jury trial in the District Court of Oklahoma County before the Honorable Eugene Mathews, District Judge, Hughes was convicted, in Case No. CRF–90–4297, of First Degree Manslaughter under 21 O.S. 1981, § 711(1) ("[h]omicide is manslaughter in the first degree ... [w]hen perpetrated without a design to effect death by a person while engaged in the commission of a misde-

meanor"). The jury also convicted Hughes of Driving Under the Influence While Involved in a Personal Injury Accident, in violation of 47 O.S.Supp.1985, § 11–904. Hughes received an eight-year prison sentence for the manslaughter conviction and a six-month suspended sentence for the driving under the influence conviction.

Pursuant to the *Rules of the Oklahoma Court of Criminal Appeals*, Rule 11.3, 22 O.S.1993, Ch. 18, App., Hughes applied to be placed on the Accelerated Docket of this Court. A verified consent to placement on the Accelerated Docket was attached to the application. The propositions or issues were presented to this Court in oral argument on October 14, 1993, pursuant to Rule 11.5(c).

Hughes argues as her sole proposition of error that her manslaughter conviction should be reversed on the basis of the common law "born alive" rule. Because Oklahoma has neither altered nor abolished this remnant of the common law, it remains in effect pursuant to 22 O.S.1981, § 9. *See also Elliott v. Mills*, 335 P.2d 1104, 1111 (Okl.Cr.1959). Under the "born alive" rule, "[a] child can not be the subject of homicide until its complete expulsion from the body of the mother, and must be alive and have independent existence." 1 O. Warren, *Warren on Homicide* § 55 (1938). In this case of first impression, Hughes claims that the fetus Ms. Poole was carrying was not born alive and that its death cannot be considered a homicide. We now abandon the common law approach and hold that whether or not it is ultimately born alive, an unborn fetus that was viable at the time of injury is a "human being" which may be the subject of a homicide under 21 O.S.1981, § 691 ("Homicide is the killing of one human being by another").

The dissent adopts the State's position that the "born alive" rule would not prohibit a manslaughter conviction in this case because the fetus in question was born alive. It is asserted that the fetus had a heartbeat at birth and the Legislature has determined that any fetus born with a heartbeat is in fact born alive. While this argument is superficially appealing, it has no merit. The evidence presented at trial established that the baby was dead when delivered.

The fetus did have a weak heartbeat. It was, however, brain dead according to the doctor to whom it was handed immediately upon delivery. Additionally, according to the testimony, the fetus had no blood pressure, no respiration and did not respond to any resuscitative efforts. We are not prepared to hold that a brain dead fetus was alive when born simply because its heart was beating weakly. Moreover, the statute relied upon by the State is a "vital statistics" statute. *See* 63 O.S.Supp.1986, § 1–301(e). The State has an interest in reporting high incidence of live births. We will not overreach and extend a statute intended for statistical purposes to a homicide case where an individual's liberty is at stake.

Today's decision abandoning the "born alive" rule is based in significant part upon its origins, history and purpose. Common law authorities refer to the born alive rule as early as the 1300's. Forsythe, *Homicide of the Unborn Child: The Born Alive Rule and Other Legal Anachronisms,* 21 Valparaiso L.R. 563, 581 (1987).[1] The born alive rule was necessitated by the state of medical technology in earlier centuries. *Id.* at 567.

In fact, as late as the nineteenth century, prior to quickening "it was virtually impossible for either the woman, a midwife, or a physician to confidently know that the woman was pregnant, or, it follows, that the child *in utero* was alive." *Id.* at 573. Hence, there was *no evidence of life* until quickening. *Id.*

Yet, the quickening of a fetus did not constitute proof that the fetus was alive in the womb at any particular moment thereafter. The health of a child within the womb could not be determined until the child was observed after birth. *Id.* at 575. "As a result, live birth was required to prove that the unborn child was alive and that the material acts were the proximate cause of death, because it could not otherwise be established if the child was alive in the womb at the time of the material acts." *Id.*

Advances in medical and scientific knowledge and technology have abolished the need for the born alive rule. Specifically, the medical and scientific evidence before us establishes that the child within Poole's womb was a living, viable fetus at the time of the collision and that this child died as a result of the placental abruption which occurred when Poole's stomach hit and broke the steering wheel of her car.

Although in the minority, two states have expressly rejected the born alive rule: Massachusetts and South Carolina.[2] The Massachusetts court addressed the question of whether a viable fetus is a "person" under that state's vehicular homicide statute in *Commonwealth v. Cass,* 392 Mass. 799, 467 N.E.2d 1324 (1984). In reaching its decision, the *Cass* court first acknowledged that it had previously held that a viable fetus was a person under the Massachusetts wrongful death statute. The court also noted that the legislature was presumed to have knowledge of judicial decisions and that the words of a statute are to be given their ordinary meaning. *Id.* 467 N.E.2d at 1325. The *Cass* court then reasoned that:

> In keeping with approved usage, and giving terms their ordinary meaning, the word 'person' is synonymous with the term 'human being.' **An offspring of human parents cannot reasonably be considered to be other than a human being, and therefore a person, first within, and then in normal course outside, the womb.** As will be shown later in this opinion, heretofore the law has not recognized that the pre-born could be the victims of homicide because of difficulties in proving the cause of death; but problems in proving causation do not detract from the personhood of the victim.

*Id.* (Emphasis added). The court then concluded that, since the legislature was pre-

---

**1.** Other articles addressing the born alive rule include McCavitt, *The "Born Alive" Rule: A Proposed Change to the New York Law Based on Modern Medical Technology,* 36 N.Y.L.Sch.L.Rev. 609 (1991) and Shannon, *Criminal Law—Manslaughter—A Fetus is not a 'Person' as the Term is used in the Manslaughter Statute,* 10 U.Ark. Little Rock L.J. 403 (1987).

**2.** Kansas also appears to have rejected the born alive rule without discussion in *State v. Burrell,* 237 Kan. 303, 699 P.2d 499 (1985).

sumed to have knowledge of the court's earlier decision regarding the personhood of a viable fetus under the wrongful death statute, the legislature contemplated that a viable fetus would be a person under the subsequently enacted vehicular homicide statute. *Id.* 467 N.E.2d at 1325–26.

The *Cass* court also established an alternative rationale to support its decision, assuming that the legislature had not considered the issue. In that event, the court reasoned, the legislature intended the term "person" be defined by "reference to established and developing common law." *Id.* 467 N.E.2d at 1326. The court then rejected the born alive rule, stating:

> The rule has been accepted as the established common law in every American jurisdiction that has considered the question. But the antiquity of a rule is no measure of its soundness. 'It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past.' ... It is time to reexamine the grounds upon which this ancient rule was laid down.
>
> The rationale offered for the rule since 1348 is that 'it is difficult to know whether [the defendant] killed the child or not....' ... That is, one could never be sure that the fetus was alive when the accused committed his act. However, difficulty of proving causation is no sound reason for denying criminal liability. Medical science now may provide competent proof as to whether the fetus was alive at the time of a defendant's conduct and whether his conduct was the cause of death. ... We do not consider [fear of speculation] a sufficient reason for refusing to consider the killing of a fetus a homicide.
>
> We think that the better rule is that infliction of prenatal injuries resulting in

the death of a viable fetus, before or after it is born, is homicide. If a person were to commit violence against a pregnant woman and destroy the fetus within her[3], we would not want the death of the fetus to go unpunished. We believe that our criminal law should extend its protection to viable fetuses.

*Id.* 467 N.E.2d at 1328–29 (citations omitted) (footnotes omitted).

One day later, South Carolina also rejected the born alive rule in *State v. Horne,* 282 S.C. 444, 319 S.E.2d 703 (1984). As in *Cass,* the *Horne* court acknowledged that it had previously held that a viable fetus was a person in the context of a wrongful death action. The *Horne* court then stated that "[i]t would be grossly inconsistent for us to construe a viable fetus as a 'person' for the purposes of imposing civil liability while refusing to give it a similar classification in the criminal context." *Id.* 319 S.E.2d at 704. Accordingly, the court held that:

> This Court has the right and the duty to develop the common law of South Carolina to better serve an ever-changing society as a whole. In this regard, the criminal law has been the subject of change. ... The fact this particular issue has not been raised or ruled on before does not mean we are prevented from declaring the common law as it should be. Therefore, we hold an action for homicide may be maintained in the future when the state can prove beyond a reasonable doubt the fetus involved was viable, i.e., able to live separate and apart from its mother without the aid of artificial support.

*Id.* This Court also has the right and duty to develop the common law of Oklahoma to serve the evolving needs of our citizens. *See* 12 O.S.1981, § 2.

To that end, we believe that the citizens of Oklahoma would be best served by a definition of "human being" in the context of Section 691 which does not rely upon an obso-

---

**3.** The Oklahoma Legislature criminalized this type of conduct in 21 O.S.1981, § 713. Section 713 provides that "[t]he willful killing of an unborn quick child by any injury committed upon the person of the mother of such child, ... is manslaughter in the first degree." The defendant in our recent opinion *Hooks v. State,* 862

P.2d 1273 (Okl.Cr.1993), was convicted under section 713 for having killed an unborn, viable fetus by fatally injuring its mother. Our holding today is not inconsistent with our holding in *Hooks,* because Hughes was charged and convicted under 21 O.S.1981, § 711 rather than section 713.

lete, antiquated common law rule. Rather, the meaning of that term should be determined by the plain language and purpose of the statute. *See Nickell v. State,* 746 P.2d 1155, 1158 (Okl.Cr.1987). The purpose of Section 691 is, ultimately, to protect human life. A viable human fetus is nothing less than human life. As stated by the court in *Cass,* "[a]n offspring of human parents cannot reasonably be considered to be other than a human being ... first within, and then in normal course outside, the womb." *Cass, supra,* 467 N.E.2d at 1325. Thus, the term "human being" in Section 691—according to its plain and ordinary meaning—includes a viable human fetus. Further, we hereby overrule *State v. Harbert,* 758 P.2d 826 (Okl.Cr.1988), in which this Court held that a viable fetus is not a "person" within the meaning of 21 O.S.1981, § 652, an assault and battery statute.

■ In Oklahoma's bifurcated appellate system, the Oklahoma Supreme Court has final jurisdiction over civil appeals, and this Court has final jurisdiction over criminal appeals. While neither Oklahoma court is obligated to adopt the reasoning of the other, consistency is certainly desirable. Our decision today is further supported by the Oklahoma Supreme Court's holding in *Evans v. Olson,* 550 P.2d 924, 927–28 (Okl.1976), that a statutory cause of action for the wrongful death of an unborn viable child exists under 12 O.S.1971, § 1053.[4] Prior to reaching this holding, the Supreme Court first recognized that "a common law negligence action [could be] brought on behalf of a surviving child which was negligently injured before its birth." *Id.* at 927. In so doing, the Supreme Court stated:

> We find the common-law in Oklahoma as to such a cause of action has been too rigid. It should be flexible and elastic enough to adapt to the facts of life in light of our scientific knowledge and modern society. Present day science, philosophy, and the great weight of the law in this country requires us to recognize such a common-law negligence action.

*Id.* The Supreme Court then found that, once a common law negligence action for a surviving child negligently injured during pregnancy is recognized, a statutory wrongful death action follows. *Id.*

Interestingly, the Supreme Court also rejected an argument that its holding was not in accord with legislative intent:

> Argument is made the legislative intent of § 1053 requires a denial of wrongful death action to a stillborn for the legislature has remained passive and not amended the statute to allow such an action since *Howell [v. Rushing,* 261 P.2d 217 (Okl. 1953) ] [i.e. an earlier judicial decision which rejected such an action] in 1953—a period of over 20 years. We do not agree. It is not § 1053 or its intent that is changed by this decision. The change comes in the common-law as applied in this jurisdiction so as to more fully adapt to present day life. The intent of § 1053 was to allow a death action if the deceased might have maintained an action had he lived. Having here recognized a common-law negligence action to a surviving child suffering a prenatal injury, it must follow that a wrongful death action may be maintained for a viable fetus which is stillborn. No violence has been done to the legislative intent under § 1053.

*Id.* at 928. Section 691 was enacted in an effort to protect human life. Our decision that this protection extends to viable human fetuses is clearly in accord with legislative intent. Moreover, in light of the civil liability which can be imposed under Oklahoma law for the wrongful death of a viable human fetus, it would be most unjust to refuse to extend protection to a viable human fetus under Oklahoma's general homicide statute. *See e.g. Horne, supra,* 319 S.E.2d at 704.

■ We wish to make it absolutely clear that our holding shall not affect a woman's constitutional right to choose a lawful abor-

---

4. Title 12 O.S.1971, § 1053 provided, in pertinent part, that "[w]hen the death of one is caused by the wrongful act or omission of another, the personal representative of the former may maintain an action therefor against the latter, or his personal representative if he is also deceased, if the former might have maintained an action had he lived, against the latter, or his representative, for an injury for the same act or omission...."

tion based upon her constitutional right to privacy or a physician's right to perform one. *Roe v. Wade,* 410 U.S. 113, 153–66, 93 S.Ct. 705, 727–33, 35 L.Ed.2d 147 (1973); *Planned Parenthood v. Casey,* 505 U.S. ——, ——, 112 S.Ct. 2791, 2804, 120 L.Ed.2d 674 (1992). Neither state statute nor caselaw can render a constitutionally protected abortion unlawful. Accordingly, today's decision to bestow upon viable human fetuses the legal status of "human being" under Oklahoma law, cannot and shall not be used as the basis for bringing homicide charges against either a woman who chooses a lawful abortion or a physician who performs a lawful abortion.

■ Having determined that an unborn viable fetus is a "human being" under Section 691, we turn to the question of whether our ruling is applicable to Hughes or should be prospective only. This question was addressed in both *Cass* and *Horne, supra.* In *Cass,* the court ruled that its decision rejecting the born alive rule would be prospective only since: (1) its decision may have been unforeseeable; (2) the possibility of increased punishment for a particular act may have been unforeseeable and could raise constitutional questions; and (3) a prospective-only decision would ensure "impartiality and regularity in decision-making." *Cass,* 467 N.E.2d at 1329–30. The *Horne* court also ruled that its decision rejecting the born alive rule would be prospective only. *Horne,* 319 S.E.2d at 704.

Due process requires that a criminal statute give fair warning of the conduct which it prohibits. Specifically, the Supreme Court of the United States has held that:

> The constitutional requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute. The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.

*United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954). With respect to judicial interpretation of a criminal statute, the Court has further held that:

an unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an ex post facto law, such as Art I, § 10, of the Constitution forbids. An ex post facto law has been defined by this Court as one 'that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action,' or 'that *aggravates* a *crime,* or makes it *greater* than it was, when committed.' ... The fundamental principle that 'the required criminal law must have existed · when the conduct in issue occurred' ... must apply to bar retroactive criminal prohibitions emanating from courts as well as from legislatures. If a judicial construction of a statute is 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue,' it must not be given retroactive effect.

*Bouie v. Columbia,* 378 U.S. 347, 353–54, 84 S.Ct. 1697, 1702–03, 12 L.Ed.2d 894 (1964) (emphasis added) (citations omitted).

Subsequently, the Court further explained, in *Marks v. United States,* 430 U.S. 188, 191–192, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977), as follows:

> The Ex Post Facto Clause is a limitation upon the powers of the legislature ... and does not of its own force apply to the Judicial Branch of government. ... But the principle on which the Clause is based—the notion that persons have a right to fair warning of that conduct which will give rise to criminal penalties—is fundamental to our concept of constitutional liberty. ... As such, that right is protected against judicial action by the Due Process Clause of the Fifth Amendment.

(Citations omitted). Hence, the question of whether the judicial construction of a statute may be applied retroactively rests on the foreseeability of the court's action. Specifically, did Hughes have "fair warning" that her conduct would result in a criminal charge?

We believe that our construction of Section 691 as including viable fetuses was not foreseeable. This conclusion is supported by the fact that Oklahoma, by means of this deci-

sion, joins a minority of two states whose courts have expressly rejected the ancient, yet obsolete, born alive rule. In addition, although Hughes had notice of the criminal nature of her conduct when she chose to drive her vehicle while under the influence, her "liability for one specific consequence of [her] conduct and the possibility of increased punishment resulting therefrom may have been unforeseeable." *Cass, supra,* 467 N.E.2d at 1329. Because Hughes did not have fair warning that her conduct was criminal and subject to punishment under Section 691, our decision should not apply to her.

That Hughes will go largely unpunished for having taken the life of another is frustrating. There are, however, basic principles upon which this country is founded which compel the result we reach. Fundamental due process of law is one of them. The retroactive application of criminal law in an ex post facto manner is so abhorrent that we must occasionally endure some frustration in order to preserve and protect the foundation of our system of law.

In conclusion, we reject the born alive rule and hold that a viable human fetus is a "human being" against whom a homicide as defined in Section 691 may be committed. The fetus that suffered fatal injuries as a result of Hughes's drunk driving was viable. However, Hughes may not be convicted for having caused its death because she could not have foreseen this Court's decision to abolish the born alive rule and effectively render her actions homicidal. Accordingly, today's ruling will apply wholly prospectively to those homicides which occur after its date.

For the reasons set forth in this opinion, Hughes' judgment and sentence for first degree manslaughter should be, and hereby is, **REVERSED** and **REMANDED** with instructions to **DISMISS**. Hughes' judgment and sentence for driving under the influence while involved in a personal injury accident is **AFFIRMED**.

LANE, J., concurs.

JOHNSON, Vice P.J., and STRUBHAR, J., specially concur.

LUMPKIN, P.J., concurs in part/dissents in part.

JOHNSON, Vice Presiding Judge, specially concurs:

I also have reservations about Treva Lanan Hughes going without punishment. I hope the loss of a life goes with her but due to the change in the law, she is without legal punishment. Her actions will be with her for the rest of her life.

The new rule of law established herein will last long into the future. It is right and it is just.

STRUBHAR, Judge, specially concurs:

I concur in the opinion of the Court. It is worrisome to acknowledge that this Court has waited until the dawn of the twenty-first century to adopt an evidentiary principle to determine a "human being" and to reject the born alive rule. I applaud the previous recognition of this principle by the Oklahoma Supreme Court in *Evans v. Olson* 550 P.2d 924 (Okl.1976). We this date properly overruled *State v. Harbert,* 758 P.2d 826 (Okl.Cr. 1988).

I must also regrettably concur with the decision of the Court to reverse this defendant's judgment and sentence for first degree manslaughter. I wish to reiterate the statement of the Court that the fact that this Appellant will essentially go unpunished for this crime is frustrating. I too believe that there are fundamental principles of due process that are so preciously guarded by the legal system of our Country that I feel compelled to concur with the conclusion reached by the Court.

LUMPKIN, Presiding Judge: concurs in part/dissents in part.

I concur in the Court's well-reasoned determination the term "human being" pursuant to 21 O.S.1981, § 691, includes a viable human fetus. It is consistent with that holding we also overrule *State v. Harbert,* 758 P.2d 826 (Okl.Cr.1988). This action allows us to sever the umbilical cord which has linked our law of evidence with antiquity long after the light of medical knowledge has dispelled the myths of the past. Our delay in acknowl-

edging this evidentiary principle is especially regrettable since almost twenty years ago the Oklahoma Supreme Court recognized in *Evans v. Olson,* 550 P.2d 924, 927–28 (Okl. 1976), the rights of an unborn viable child to be compensated for injuries which occurred prior to birth, together with the right of a cause of action for the wrongful death of an unborn viable child.

However, the Court stopped short in its application of the law to the facts of this case and I must dissent to the Court's decision the judgment and sentence for First Degree Manslaughter must be reversed and remanded with instructions to dismiss. The Court, in effect, recognizes the "born alive rule" is evidentiary, not substantive, in nature. Disregarding the fact we are dealing with an evidentiary matter rather than an issue of substantive criminal law, the Court then errantly determines this item of evidence cannot be applied to this Appellant. The Court cites 12 O.S.1981, § 2, for the legal principal the common law is applicable in Oklahoma. It should be noted 12 O.S.1981, § 1, states "this chapter shall be known as the code of civil procedure of the State of Oklahoma". The Code of Criminal Procedure, 22 O.S. 1981, § 1, et seq. provides at Section 9, "[t]he procedure, practice and pleadings in the courts of record of this State, in criminal actions or in matters of criminal nature, not specifically provided for in this code, shall be in accordance with the procedure practice and pleadings of the common law". While I do not disagree the common law can serve as an aid to interpretation, *See State v. Barnett,* 60 Okl.Cr. 355, 372–73, 69 P.2d 77 (1937); *Stewart v. State,* 4 Okl.Cr. 564, 565–66, 109 P. 243 (1910); *Shires v. State,* 2 Okl.Cr. 89, 90 (syllabus), 99 P. 1100 (1909), there are no common law crimes in this State, as is made clear by 21 O.S.1981, § 2. *See also Hisel v. State,* 97 Okl.Cr. 356, 366, 264 P.2d 375 (1954). Therefore, the application of 21 O.S. 1981, § 691, is an application of a substantive criminal statute which was originally codified in 1910. The discussion regarding retroactivity and foreseeability is therefore inappropriate, and not applicable. To apply the discussion of retroactivity to new methods of evidentiary proof would, in effect, mean each conviction which resulted from the adoption of new technologies or methods of meeting the burden of proof would be required to be reversed and dismissed because a defendant could not have foreseen the ability of the State to have proved the elements through that methodology. I do not believe any Court knowingly desires to adopt that jurisprudence.

The second basis of my dissent to the Court's decision to reverse and dismiss the conviction of Manslaughter relates to the determination the child was dead upon delivery. The evidence indicates that as a result of an automobile accident between Appellant and an expectant mother, a viable unborn child was injured. The accident occurred on August 2, 1990. The mother had been examined by her obstetrician on July 30, the unborn child was viable and the due date for delivery was set at August 6, four (4) days after the accident. At the time of the accident, the mother was thrown forward and her stomach hit and broke the steering wheel. Upon arrival at the hospital, a fetal heartbeat of 70–90 beats per minute was detected. After an emergency caesarean section was performed, the baby was delivered at 9:02 p.m. The baby had a heartbeat, but was not breathing on its own or moving. A placenta abruption was observed by the attending physician. Upon delivery, the baby was given to a pediatrician, who attempted resuscitation efforts; however, the baby's condition deteriorated rapidly and the heartbeat did not improve. The baby was pronounced dead at 10:10 p.m., over an hour after delivery. The medical examiner testified the child would have lived absent the trauma. It must also be noted, the physician who made the statement the child was brain dead when born did so only on the basis of a visual observation. The child was not placed on a monitor to determine activity in the brain.

I find the Court has erred in its scope of review. The opinion seems to forget this Court is not to substitute its view of the evidence for the jury's; rather, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the

crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979) (citations omitted) (emphasis in original). *Spuehler v. State*, 709 P.2d 202, 203–04 (Okl.Cr. 1985). In the light most favorable to the prosecution, a baby who had a heartbeat before and after delivery, and who was not pronounced dead until over an hour after delivery, was alive. Thus, the verdict of the trier of fact should be affirmed. This is made clear by our Legislature's definition of "live birth" as it is used in connection with vital statistics governing birth and death:

> The term 'live birth' means the complete expulsion or extraction from its mother of a product of human conception, irrespective of the duration of pregnancy, which, after such expulsion of extraction, breathes *or shows any other evidence of life such as beating of the heart*, pulsation of the umbilical cord or definite movement of voluntary muscles, whether or not the umbilical cord has been cut or the placenta is attached.

63 O.S.Supp.1986, § 1–301(e) (emphasis added). The Court seeks to avoid this statute by limiting its application based on it being a "vital statistic statute". However, as the Oklahoma Supreme Court noted when it adopted the language from Corpus Juris Secundum, "[i]n general, the location of statutes in particular places in codes does not affect their force or validity". See *Green v. Green*, 309 P.2d 276, 278 (Okl.1957). This is an action of the Legislature to provide a definition for the term "live birth" which is sufficient to abrogate the application of common law definitions.

This act of the Legislature also dilutes the Court's discussion of the foreseeability of the inclusion of a "viable human fetus" as a human being within the meaning of Section 691. In that analysis of the applicability of this decision to the present case, it also seems to at least infer this Court's previous decision in *Harbert* contributed to the Appellant's inability to "forsee" the acts committed as being criminal acts. The Court should not use this prior, patently erroneous, decision as a basis to find the crime in this case was not foreseeable by Appellant.

While the baby may not have had much of a chance, there was clearly a "live birth" as our Legislature has defined it. Under the evidence presented here, the baby was born alive, then died as a result of injuries sustained by Appellant's actions. The Court can arrive at this result by applying existing common law precepts and statutory language in place at the time Appellant committed the offense. This is especially true in light of the 1976 decision by the Oklahoma Supreme Court in *Evans v. Olson*.

Based on the law and evidence applicable to the facts of this case, I would affirm the judgment and sentence for manslaughter, first degree, together with the judgment and sentence for driving under the influence while involved in a personal injury accident. However, under the Court's opinion in this case, the victim, Nichole Michelle Hodgens, has provided the impetus for a very positive change in our law. She should therefore be remembered as a person who has contributed to the betterment of our society.