1997 OK 156

**Frank W. DAVIS, Larry Ferguson, Robert Worthen, Tim Pope, Dan Webb, Charles Gray, Charles Key, Joan Greenwood, Carolyn Coleman, Wayne Cozort, Leonard Sullivan, Grover Campbell, Wayne Pettigrew, Mike O'Neal, Jim Reese, Richard Phillips, John Smaligo, Mike Thornbrugh, Doug Miller, John Sullivan, Scott Adkins, Fred Perry, Odilia Dank, Sharon Golmoradi and Craig Evans, M.D., Appellants,**

v.

**Dan H. FIEKER, President of Oklahoma State Board of Health, Gordon H. Deckert, Vice President of the Oklahoma State Board of Health, Beth Anita Gordon, Glen Diacon, Jr., R. Brent Smith, Frank W. Merrick, John B. Carmichael, Jay A. Gregory, Walter Scott, Members of the Oklahoma State Board of Health, Jerry Nida, Commissioner of the Oklahoma State Board of Health and the Department of Health of the State of Oklahoma, Appellees.**

No. 88420.

Supreme Court of Oklahoma.

Dec. 23, 1997.

Opinion Supplementing Decision on Grant of Rehearing Jan. 27, 1998.

---

William D. (Bill) Graves, Oklahoma City, for Appellants.

Jack L. Atkinson, Suzanne W. Nichols, Oklahoma State Department of Health, Oklahoma City, for Appellees.

Dara Klassel, Legal Action for Reproductive Rights Planned Parenthood Federation of American, Inc., New York City, Linda G.

Scoggins, Oklahoma City, Margaret A. Swimmer, William H. Hinkle, Tulsa, for amici curiae Planned Parenthood of Central Oklahoma, Inc., Planned Parenthood of Eastern Oklahoma and Western Arkansas, Inc., The Religious Coalition for Reproductive Choice, American Civil Liberties Union of Oklahoma, and Oklahoma National Abortion Rights Action League.

Michael L. Tinney, Oklahoma City, Mark D. Mitchell, John B. Davis, Metheny, Mitchell, Davis, & Klein, Steve Nash, Oklahoma City, for amici curiae, The Oklahoma Family Policy Council, The Oklahoma Christian Coalition, Eagle Forum, Concerned Women of America, and Oklahomans for Children and Families.

HODGES, Justice.

¶ 1 The principle issue in this case is whether the district court erred in finding that sections 1–731 and 1–737 of title 63 restricting abortions to certain facilities are unconstitutional. The other issue in this case is whether the trial court erred in dismissing individual members of the Oklahoma State Board of Health (Board) as defendants and denying the petition for writ of mandamus. We find that, on the record before this Court, sections 1–731 and 1–737 are not unconstitutional and a writ of mandamus should issue against the Commissioner of the Oklahoma State Board of Health.

### I. Facts

¶ 2 In 1973, the United States Supreme Court in *Roe v. Wade*[1] severely limited a state's ability to regulate abortion particularly in the first and second trimesters. In 1978, the Oklahoma Legislature enacted legislation requiring first trimester abortions to be performed in facilities licensed by the state,[2] requiring abortions performed between the end of the first trimester and pre-viability be carried out in general hospitals,[3] and banning nontherapeutic[4] abortions after viability.[5]

¶ 3 In 1984, Oklahoma's Attorney General opined that these restrictions on abortion were unconstitutional[6] and that the Department of Health (Department) was not required to follow his opinion but was bound by the United States Constitution.[7] Thereafter, the Department refused to enforce these restrictions. In 1992, the United States Supreme Court issued *Planned Parenthood of Southeastern Pennsylvania v. Casey*[8] which held that the right to abortion was a liberty interest, abortions should be reviewed under an "undue burden test", and overruled several of its previous decisions regulating abortions.

¶ 4 Twenty-three Oklahoma legislators, a physician practicing in Oklahoma, and a woman who allegedly had suffered injury from an abortion performed in a clinic[9] (collectively, plaintiffs) filed this suit against the individual members of the Board, the Commissioner of the Department, and the Attorney General of Oklahoma, asking that the Department be compelled to enact standards regulating abortions and to enforce the Oklahoma Statutes requiring abortions be performed in certain facilities. Later, the Department was added, and the Attorney General was dismissed as a defendant.

1. 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

2. Okla.Stat. tit. 63, § 1–737 (1991).

3. *Id.* at §§ 1–731, 1–737.

4. The term nontherapeutic abortion as used here is one which is performed for reasons other than abortions which are necessary "to prevent the death of the pregnant woman or to prevent an impairment to her health." *See id.* at § 1–732(C).

5. *Id.* at §§ 1–732(C).

6. Op. Att'y Gen. No. 83–182 (1984).

7. *Id.* at No. 91–10 (1991).

8. 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992).

9. The record does not show at what date the plaintiff Sharon Golmoradi had the abortion which allegedly caused the injuries or if the abortions fell within the statutory restrictions. The petition reflects the Golmoradi's alleged injuries were not a result of the abortion being performed in a clinic but allegedly the doctor's failure to instruct her as to post-abortion care.

508

¶5 The parties stipulated to the following facts. The legislative plaintiffs have standing to bring the suit. Certain plaintiffs are members on the Board, and the Commissioner has the duty to administer and enforce the laws regarding the Department. In 1979, the Board promulgated rules for the licensure and governance of abortion facilities, but the Commissioner has not enforced either the rules or statutes since the Attorney General rendered his opinions finding Oklahoma's statutes were unconstitutional. Currently, ambulatory surgical centers, hospitals, nursing facilities, hospices, home care agencies, birthing centers, alcoholism treatment centers, and emergency medical services are regulated by the Department. Between 1981 and 1997, there were three abortion-related deaths in Oklahoma.

¶6 At the hearing, the trial judge refused to admit petitions filed in district courts alleging malpractice by doctors performing abortions. The trial judge also refused to hear plaintiffs' evidence regarding the need to regulate abortion facilities and the need for certain emergency equipment. Also rejected was the testimony of the plaintiff, Ms. Golmoradi, regarding the complications from her abortion. The defendants argued without presenting supporting evidence that the effect of the statutes and rules regulating abortion would create an undue burden on the right to have an abortion.[10] The district court held that the individual members of the Board were not proper parties and dismissed them from the suit. The district court found that the statutes regulating abortions were unconstitutional and denied the petition for writ of mandamus.

¶7 The plaintiffs filed a petition in error preserving for this Court's review the following issues: (1) whether mandamus is an appropriate remedy in this case, (2) whether sections 1–731 and 1–737 of title 63 of the Oklahoma Statutes are constitutional, and (3) whether the trial judge improperly excluded testimony of plaintiff's expert and evidence of malpractice suits filed in district courts. This Court retained the case for disposition.

## II. Standing

¶8 Standing is based on an interest in the proceeding that is "direct, immediate and substantial."[11] The plaintiff Sharon Golmoradi has undergone two abortions which were done in private clinics. One of the abortions resulted in her suffering physical injury in the form of hemorrhaging. The plaintiff Dr. Craig Evans is a physician who is practicing medicine in Oklahoma County, Oklahoma. Both of these plaintiffs have a direct, immediate and substantial interest in the enforcement of the statutes and regulations at issue in this case: Ms. Golmoradi because of her previous injury and Dr. Evans because of his status as a practicing physician.

¶9 We need not address the standing of the plaintiffs which are members of the Oklahoma Legislature since we find that the other two plaintiffs have standing.[12] Rather our decision rests on the standing of Ms. Golmoradi and Dr. Evans.

## III. Writ of Mandamus

¶10 The defendants argue that mandamus is not a proper remedy in this case because promulgation of rules and enforcement of both rules and statutes are discretionary functions and there is not a plain legal duty to perform discretionary functions.

10. The *amici curiae* brief supporting the defendants' position presents evidentiary information that limiting the performance of abortions to general hospitals after the first trimester places an undue burden on women seeking an abortion. This evidentiary information is not part of the record on appeal and cannot properly be considered by this Court. *Anderson v. Eichner*, 1994 OK 136, n. 7, 890 P.2d 1329.

11. *In re Doan*, 1986 OK 15, ¶7, 727 P.2d 574, 576.

12. The plaintiffs which are members of the Legislature are: Frank W. Davis, Larry Ferguson, Robert Worthen, Tim Pope, Dan Webb, Charles Gray, Charles Key, Joan Greenwood, Carolyn Coleman, Wayne Cozort, Leonard Sullivan, Grover Campbell, Wayne Pettigrew, Mike O'Neal, Jim Reese, Richard Phillips, John Smaligo, Mike Thornbrugh, Doug Miller, John Sullivan, Scott Adkins, Fred Perry, and Odilia Dank.

¶ 11 We first note that in 1979, the Board promulgated regulations governing the licensure of abortion facilities. The defendants have not argued that the 1979 regulations which are still effective, even though not enforced, are inconsistent with the abortion statutes or that the regulations do not meet the mandate of section 1–737. This leaves the question of whether mandamus is proper as to the enforcement of the statutes and regulations.

¶ 12 Writs of mandamus are governed by sections 1451 and 1452 of title 12 of the Oklahoma Statutes. Section 1451 provides that a writ of mandamus may issue "to any ... board or person ... to compel the performance of any act which the law specially enjoins as a duty, resulting from an office, trust or station." Section 1452 prohibits the issuance of a writ "where there is a plain and adequate remedy in the ordinary course of the law."

¶ 13 Here, the Commissioner has the duty to enforce the "rules, regulations and standards adopted by the State Board of Health."[13] Although the Commissioner has the discretion as to the enforcement in individual cases, he does not have the discretion to ignore valid regulations regarding licensure of abortion facilities.[14] Because the Commissioner has the clear legal duty to enforce valid regulations, the next issue in this case is whether the statutes underlying the licensure standards are constitutional.

### IV: Oklahoma's Statutes Regulating Abortion

¶ 14 As stated above, under Oklahoma's statutory scheme, the Oklahoma State Board of Health has the power to adopt rules and regulations to carry out the provisions of the Oklahoma Public Health Code.[15] The State Commissioner of Health is charged with enforcing the rules and regulations adopted by the Board.[16]

¶ 15 In 1978, the Oklahoma Legislature enacted sections 1–731(B) and 1–737 of title 63 of the Oklahoma Statutes as part of the Oklahoma Public Health Code. Section 1–731(B) provides:

No person shall perform or induce an abortion upon a pregnant woman subsequent to the end of the first trimester of her pregnancy, unless such abortion is performed or induced in a general hospital.

Section 1–737 provides:

An abortion otherwise permitted by law shall be performed only in a hospital, as defined in this article, which meets standards set by the Department. The Department shall develop and promulgate reasonable standards relating to abortions.

Section 1–732 prohibits abortions after the fetus is viable[17] except for preservation of a woman's life or health. Section 1–732 creates a rebuttable presumption that a fetus is viable 24 weeks after the pregnant woman's last normal menstrual period.

¶ 16 Section 1–701(1) defines hospitals to include "places where pregnant females are admitted and receive care incident to pregnancy, abortion or delivery." A general hospital is "a hospital maintained for the purpose of providing hospital care in a broad category of illness and injury."[18]

¶ 17 In 1979, pursuant to section 1–737, the Department promulgated regulations governing abortions. The abortions follow the statutory scheme established in title 63. The effect of the statutory scheme and the regulations is to permit abortions during the first trimester[19] to be performed in hospi-

---

13. Okla.Stat. tit. 63, § 1–106(B)(2) (1991).

14. *See State v. Okla. Corp. Comm'n, 1980 OK 96,* 614 P.2d 45.

15. Okla.Stat. tit. 63, § 1–104 (1991).

16. *Id.* at § 1–106(B)(2).

17. A fetus become viable when it has reached a stage where it can live and develop outside the womb. *See* The American Heritage Dictionary 1346 (2nd ed. 1976).

18. Okla.Stat. tit. 63, § 1–701(2) (1991).

19. Full term of pregnancy is reached at 40 weeks after a woman's last normal menstrual period. Ralph C. Benson, M.D., HANDBOOK OF OBSTETRICS & GYNECOLOGY 65 (1992). The first trimester ends at thirteen and one-half weeks after a woman's last normal menstrual period. Viability of the fetus is possible 24 weeks after a woman's last normal menstrual period. Benson, *supra,* at 81; *see* Okla.Stat. tit. 63, § 1–732(B) (1991).

tals, which under section 1–701(1) includes clinics and any other place that abortions are performed. From the end of the first trimester until the fetus becomes viable, abortions are statutorily permitted but must be performed in general hospitals as defined in section 1–701(2). After the fetus becomes viable, abortion is prohibited except to preserve the life and health of the pregnant woman.

## V. United States Supreme Court Decisions Before *Casey*

¶ 18    In 1973, the United States Supreme Court decided *Roe v. Wade*,[20] holding that a woman had a constitutional right to have an abortion and that a compelling state interest was necessary to advance state regulation.[21] The *Roe* court recognized a state's interest in "protecting the potentiality of human life" of the unborn child,[22] in safeguarding pregnant women's health, and appropriate medical standards.[23] The Court addressed the interest of a state based on trimesters of the woman's pregnancy.

¶ 19    Under *Roe*, these state interests became more compelling as the pregnancy progressed,[24] and a state's interest in the health of pregnant women became compelling at approximately the end of the first trimester.[25] After the end of the first trimester, permissible state regulation included "the facility in which the procedure [was] to be performed, that is, whether it [had to] be a hospital or [might] be a clinic or some other place of less-than-hospital status."[26]

¶ 20    A state's interest in protecting potential human life became compelling at viability.[27] At the point of viability, a state could not only regulate abortion but also prohibit abortion.[28]

¶ 21 · The United States Supreme Court decided *Doe v. Bolton*,[29] on the same day as *Roe*. *Doe* addressed Georgia's abortion restrictions including the requirement that abortions be performed in a hospital licensed by the Board and accredited by the Joint Commission on Accreditation of Hospitals.[30] Under Georgia's law, the definition of hospital was not sufficiently broad to include facilities, other than hospitals, which were adequately equipped to handle abortions.

¶ 22    In striking down Georgia's hospital-related requirements, the Court noted that the Joint Commission on Accreditation of Hospitals accreditation requirement was not "reasonably related to the purposes of the Act."[31] The Court held "that the hospital requirement of the Georgia law, because it fails to exclude the first trimester of pregnancy, ... is also invalid."[32]

¶ 23    Then in 1983, the United Supreme Court once again faced issues relating to abortion regulations in *City of Akron v. Akron Center for Reproductive Health, Inc.*,[33] *Planned Parenthood Ass'n of Kansas City, Missouri, Inc. v. Ashcroft*,[34] and *Simopoulos v. Virginia*[35]. Continuing the *Roe* reasoning that a woman has a fundamental right to abortion, the Court in *Akron* recognized that a state could regulate abortion during the first trimester so long as the regulation did

---

**20.**   410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

**21.**   *Id.* at 155, 93 S.Ct. at 727.

**22.**   *Id.* at 162, 93 S.Ct. at 731.

**23.**   *Id.* at 154, 93 S.Ct. at 727.

**24.**   *Id.* at 162–63, 93 S.Ct. at 731–32.

**25.**   *Id.* at 163, 93 S.Ct. at 731.

**26.**   *Id.*

**27.**   *Id.*

**28.**   *Id.*

**29.**   410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973).

**30.**   *Id.* at 184, 93 S.Ct. at 743.

**31.**   *Id.* at 194, 93 S.Ct. at 748.

**32.**   *Id.* at 195, 93 S.Ct. at 749.

**33.**   462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983) *overruled in part by Casey*, 505 U.S. at 870, 112 S.Ct. at 2816.

**34.**   462 U.S. 476, 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983).

**35.**   462 U.S. 506, 103 S.Ct. 2532, 76 L.Ed.2d 755 (1983).

not "significant[ly] impact on the woman's exercise of her right" and the regulation was "justified by important state health objectives." [36] From the beginning of the second trimester until viability, a state could adopt regulations "reasonably relate[d] to the preservation and protection of maternal health," [37] and "legitimately related to the objective the State [sought] to accomplish." [38]

¶ 24 The *Akron* Court struck down as unconstitutional an ordinance requiring all abortions after the end of the first trimester to be performed only in acute-care, full-service hospitals. [39] The Court relied heavily on evidence that the cost of an abortion performed in a general hospital was more than twice as much as those performed in a clinic, "second-trimester abortions were rarely performed in Akron hospitals," and medical commentary supported that "at least during the early weeks of the second trimester ... abortions [could] be performed as safely in an outpatient clinic as in a full service hospital." [40] The Court also struck down a requirement that counseling for the purposes of obtaining informed consent had to be done by the physician and could not be delegated to an assistant. [41]

¶ 25 *Ashcroft* dealt with several Missouri abortion statutes, one of which restricted abortions after the twelfth week of pregnancy to hospitals. [42] The Court adopted the definition of hospital as "a general acute-care facility." [43] Relying on *Akron*, the Court

summarily found the Missouri statute to be unconstitutional.

¶ 26 In *Simopoulos v. Virginia*, [44] a doctor was convicted for performing a second-trimester abortion outside a hospital. Under Virginia law, a hospital included outpatient hospitals. [45] Virginia's regulations defined outpatient hospitals to include facilities "which primarily provide facilities for the performance of surgical procedures on outpatients." [46] The regulations permitted second trimester abortions in such clinics. [47] With only a few exceptions, the regulations licensing the outpatient hospitals in which abortions were performed applied to all outpatient hospitals. [48] The Court upheld the regulations because of Virginia's interest in protecting its citizens, in regulating second-trimester abortions, in setting standards for medical facilities, and in having its regulations consistent with accepted medical practice. [49]

## VI. Oklahoma Attorney General's Opinions

¶ 27 With this as the background, Oklahoma's Attorney General was asked whether Oklahoma's statutory scheme regulating abortions was constitutional. [50] Because Oklahoma's requirements regarding where abortions could be performed were virtually identical to those in *Akron*, the Attorney General reasoned that Oklahoma's regulations were unconstitutional. [51] After the At-

**36.** *Akron* at 429, 103 S.Ct. at 2492.

**37.** *Id.* at 430–31, 103 S.Ct. at 2492–93 (quoting *Roe*, 410 U.S. at 163, 93 S.Ct. at 731).

**38.** *Id.* at 431, 103 S.Ct. at 2493 (quoting *Doe v. Bolton*, 410 U.S. 179, 195, 93 S.Ct. 739, 749, 35 L.Ed.2d 201 (1973)).

**39.** *Id.* at 432, 103 S.Ct. at 2493.

**40.** *Id.* at 434–35, 437, 103 S.Ct. at 2494–95, 2496.

**41.** *Id.* at 448, 103 S.Ct. at 2502.

**42.** 462 U.S. at 478, 103 S.Ct. at 2518.

**43.** *Id.* at 481 n. 6, 103 S.Ct. at 2520 n. 6.

**44.** 462 U.S. at 506, 103 S.Ct. at 2533.

**45.** *Id.* at 512, 103 S.Ct. at 2536.

**46.** *Id.* at 514, 103 S.Ct. at 2537.

**47.** *Id.* at 514–15, 103 S.Ct. at 2537–38.

**48.** *Id.*

**49.** *Id.* at 516–17, 103 S.Ct. at 2538–39.

**50.** Ok. Att'y Gen. Op. 83–182 (1984).

**51.** *Id.* Specifically, the opinion states:

It is, therefore, the official opinion of the Attorney General that:
1. Based upon the United States Supreme Court decisions ... 63 O.S.1981, § 731(B) which provides that an abortion performed subsequent to the end of the first trimester of pregnancy be performed or induced in a general hospital, is unconstitutional because it unreasonably infringes upon a woman's constitutional right to obtain an abortion; and

torney General rendered this opinion in 1984, the Department ceased enforcing sections 1–731 and 1–737 of title 63.

¶ 28 Then in 1991, the Attorney General was asked whether his 1984 opinion was binding on the Department.[52] The General answered that the 1984 opinion was advisory as to the Department, but the Department was bound to follow United States Supreme Court decisions and failure to do so could result in a loss of qualified immunity from liability.[53] The opinion concluded that the Department could follow the opinion but was not compelled to do so.[54]

## VII. Planned Parenthood of Southeastern Pennsylvania v. Casey [55] and Progeny

¶ 29 Until 1989, when it decided *Webster v. Reproductive Health Services*,[56] the United States Supreme Court resisted attempts to undermine *Roe*.[57] Relying on its previous holdings that neither the states nor the federal government was required to expend public funds for nontherapeutic abortions, the *Webster* Court reasoned that a state could prohibit the use of public hospitals for nontherapeutic abortions as well.[58] The Court also upheld a statute requiring a doctor who believes a woman to be twenty or more weeks pregnant to conduct a battery of tests to determine viability.

¶ 30 In 1992, the United States Supreme Court decided *Casey* and, while receding from *Roe*, refused to overrule it.[59] Although leaving a great deal of uncertainty, *Casey* made clear: (1) a state may ban nontherapeutic abortions after the fetus becomes viable,[60] (2) the fact that a regulation increases the cost or decreases the availability of an abortion is insufficient to invalidate the regulation,[61] (3) a state may not impose a regulation that "has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus," [62] (4) a state may enact necessary regulations to protect the health of a pregnant woman so long as the regulations do not "impose an undue burden on the right" to have an abor-

2. Title 63 O.S.1981, § 1–737 which provides that an abortion otherwise permitted by law shall be performed only in a hospital, extends the interest of the State in regulating abortions beyond permissible limits and is unconstitutional.

52. Ok. Att'y Gen. Op. 91–10 (1991).

53. *Id.*

54. *Id.*

55. 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992).

56. 492 U.S. 490, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989).

57. Jethro K. Lieberman, The Evolving Constitution 24 (1992); *see Thornburgh v. American College of Obstetricians and Gynecologists*, 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986) *overruled in part by Casey*, 505 U.S. at 870, 112 S.Ct. at 2816 (invalidating statutes requiring women to be advised of financial assistance for child, detrimental physical and psychological effects, and particular medical risks, governing care of abortions done after viability of the fetus, and requiring presence of second physician without excepting medical emergency); *Bellotti v. Baird*, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (invaliding parental consent requirement); *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976) (invaliding spousal consent requirement, ban on certain procedures after first trimester, blanket parental consent requirement, but upholding woman's written consent requirement and hospital record keeping requirement); *State v. Menillo*, 423 U.S. 9, 96 S.Ct. 170, 46 L.Ed.2d 152 (1975) (upholding requirement abortion be performed by physician; *but cf. H.L. v. Matheson*, 450 U.S. 398, 101 S.Ct. 1164, 67 L.Ed.2d 388 (1981) (upholding parental notification for an unemancipated minor who lives with and is dependent on parents and does not allege sufficient maturity to make decision to have abortion or bad relationship with parents.)

The United Supreme Court has never required a state to fund abortions. *Webster v. Reproductive Health Services*, 492 U.S. at 1989; *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980); *Beal v. Doe*, 432 U.S. 438, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977); *Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977); *Poelker v. Doe*, 432 U.S. 519, 97 S.Ct. 2391, 53 L.Ed.2d 528 (1977); *Singleton v. Wulff*, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976).

58. 492 U.S. at 490, 109 S.Ct. at 3043.

59. 505 U.S. at 846, 112 S.Ct. at 2804.

60. *Id.* at 860, 112 S.Ct. at 2811.

61. *Id.* at 874, 112 S.Ct. at 2818.

62. *Id.* at 877, 112 S.Ct. at 2820.

tion,[63] and (5) regulations not reasonably related to the goal of protecting the health of the pregnant woman and the potential life of the fetus unduly burden the woman's right to abortions.[64]

¶ 31 Applying these principles to the statutes at issue and overruling previous holdings including parts of *Akron*, the *Casey* Court upheld a requirement that 24 hours before an abortion, a doctor was to "inform the woman of the nature of the procedure, the health risks of the abortion and childbirth, and the 'probable gestational age of the unborn child,'" make available printed materials, and obtain the woman's written consent.[65] The Court struck down a spousal notification requirement citing statistics on spousal abuse and finding that the requirement was "likely to prevent a significant number of women from obtaining an abortions."[66] In contrast, the Court found that parental consent provisions were constitutional provided there were "adequate judicial by-pass procedures."[67] It also upheld recording-keeping and reporting requirements.[68]

¶ 32 A review of the *Casey* opinion shows that legal findings regarding the constitutionality of the statutes at issue were based on the record before the Court and on the evidence of the effect of the statutes on a woman's right to seek an abortion.[69] Upholding a provision requiring the physician provide certain information to the pregnant woman, the Court relied on the fact that "there [was] no evidence on [the] record that requiring a doctor to give the information ... would amount in practical terms to a substantial obstacle to a woman seeking an abortion."[70] Then in upholding a 24–hour waiting period, the Court noted that even though the statute had the effect of "increasing the cost and risk of delay of abortions," the district court did not find this negative effect amounted to substantial obstacles. Likewise, the Court based its decision that the spousal notification requirement was unconstitutional on extensive evidence of spousal abuse and the abuse's effect on a woman's right to seek an abortion.[71] Thus, the opinion made clear the decision was based on the record before it.[72]

¶ 33 Since the 1992 decision in *Casey*, the United States Supreme Court has upheld a statute requiring either that a minor's parent be notified or a court finding that notification is not in the minor's best interest before an abortion can be performed.[73] Even before *Casey*, the Court held that a state may fund childbirth without funding abortion,[74] and, after *Casey*, upheld an Arkansas statute prohibiting the expenditure of public funds except to preserve the life of the pregnant woman.[75]

¶ 34 In 1997, the United States Supreme Court decided *Mazurek v. Armstrong*.[76] In *Mazurek*, plaintiffs sought to enjoin the enforcement of a statute requiring abortions to be performed by physicians only. In denying a preliminary injunction, the Court found that the plaintiffs had failed to establish a likelihood of prevailing on the merits of the claim. The Court found the plaintiffs had

---

63. *Id.* at 878, 112 S.Ct. at 2821.

64. *Id.*

65. *Id.* at 881–87, 112 S.Ct. at 2822–26 (overruling *Akron*, 462 U.S. at 416, 103 S.Ct. at 2485).

66. *Id.* at 893, 112 S.Ct. at 2828.

67. *Id.* at 899, 112 S.Ct. at 2832.

68. *Id.* at 900, 112 S.Ct. at 2832.

69. *Id.* at 884, 887, 888, 112 S.Ct. at 2824, 2825, 2826.

70. *Id.* at 884, 112 S.Ct. at 2824.

71. *Id.* at 887–98, 112 S.Ct. at 2825–31.

72. *Id.* at 885–86, 112 S.Ct. at 2824–25; *id.* at 926, 112 S.Ct. at 2845 (Blackmun, J., concurring in part and dissenting in part); *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 510 U.S. 1309, 114 S.Ct. 909, 127 L.Ed.2d 352 (1994) (decision by Justice Souter, in chambers).

73. *Lambert v. Wicklund*, —— U.S. ——, 117 S.Ct. 1169, 137 L.Ed.2d 464 (1997).

74. *Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977).

75. *Dalton v. Little Rock Family Planning Services*, 516 U.S. 474, 116 S.Ct. 1063, 134 L.Ed.2d 115 (1996).

76. —— U.S. ——, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997).

failed to make a clear showing that the statute had an unlawful purpose and noted that there was insufficient evidence that it caused an undue burden on the right to abortion.[77] The teaching of *Mazurek* is that a state has wide latitude in regulating abortion so long as the regulation's purpose is not to prevent abortions and the regulation does not present a substantial obstacle in obtaining an abortion.

## VIII.  The Standard for Facial Attacks on Abortion Regulations

■ ¶ 35  Since the *Casey* decision, there has been confusion on the proper standard to be applied in facial attacks of abortion regulations.[78]  In the *United States v. Salerno*,[79] the United States Supreme Court stated: "A facial challenge to a Legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."[80]  In contrast, the *Casey* Court applied the "undue burden" test to a facial attack on abortion regulations.[81]  Thus, under the *Casey* standard, an abortion regulation will not be upheld against a facial attack if it "has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus."[82]  Then concurring to a denial of injunctive relief on an attack of the North Dakota Abortion Control Act, Justice O'Connor wrote, with Justice Souter joining: "[W]e made clear that a law restricting abortions constitutes an undue burden, and hence is invalid, if, 'in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial ob-

stacle to a woman's choice to undergo an abortion.' "[83]

¶ 36  Because the challengers, the defendants in this case, do not argue that there are no set of circumstances under which sections 1–731 and 1–737 would be valid, the statutes withstand the *Salerno* test for a facial attack on the record before us.  Thus, we analyze the validity of the statutes under the undue-burden test.

## IX.  Validity of Sections 1–731 and 1–737

■ ¶ 37  In determining the validity of Oklahoma's abortion restrictions, it is the duty of this Court to uphold the law and apply federal constitutional law[84] but not to base a decision on our personal beliefs.  As the United States Supreme Court stated:

> Men and women of good conscience can disagree, and we suppose some always shall disagree, about the profound moral and spiritual implications of terminating a pregnancy, even in its earliest stage.  Some of us as individuals find abortion offensive to our most basic principles of morality, but that cannot control our decision.  Our obligation is to define the liberty of all, not to mandate our own moral code.  The underlying constitutional issue is whether the State can resolve these philosophic questions in such a definitive way that a woman lacks all choice in the matter, except perhaps in those rare circumstances in which the pregnancy is itself a danger to her own life or health, or is the result of rape or incest.[85]

¶ 38  As stated above, the Oklahoma statutes regulation abortion can be divided into three distinct phases.  First, from conception

**77.**  *Id.* at ——, 117 S.Ct. at 1867.

**78.**  *Planned Parenthood, Sioux Falls Clinic v. Miller*, 63 F.3d 1452, 1456–58 (8th Cir.1995); *Fargo Women's Health Organization v. Schafer*, 18 F.3d 526, 530 (8th Cir.1994); *Women's Medical Prof. Corp. v. Voinovich*, 911 F.Supp. 1051, 1060 (S.D.Ohio 1995); *Women's Choice–East Side Women's Clinic v. Newman*, 904 F.Supp. 1434, 1447 (S.D.Ind.1995).

**79.**  481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987).

**80.**  *Id.* at 745, 107 S.Ct. at 2100.

**81.**  *Casey*, 505 U.S. at 876–77, 112 S.Ct. at 2820–21.

**82.**  *Id.* at 877, 112 S.Ct. at 2820.

**83.**  *Fargo Women's Health Org. v. Schafer*, 507 U.S. 1013, 113 S.Ct. 1668, 123 L.Ed.2d 285 (1993).

**84.**  *In re Initiative Petition No. 349*, 838 P.2d 1, 7, 1992 OK 122.

**85.**  *Casey*, 505 U.S. at 850, 112 S.Ct. at 2806.

until the end of the first trimester, the abortion must be performed in a hospital which includes offices and clinics.[86] Second, from the end of the first trimester until viability (presumed to be 22 weeks post-conception), abortions must be performed in a general hospital.[87] Third, after viability, nontherapeutic abortions are prohibited.[88] The statute prohibiting nontherapeutic abortions after viability has not been attacked and is valid under *Casey* [89] and this Court's decision in *In re Initiative Petition No. 349*.[90] Unlike Initiative Petition Number 349's effect, the effect of sections 1–731 and 1–737 would not be to prohibit all abortions but to place restrictions on the place where abortions are performed.

¶ 39 We must then look to the record before us as the source of information to determine whether the evidence shows that restricting abortions performed during the first trimester to hospitals, including clinics and offices, and restricting abortions performed during the second trimester before viability to general hospitals places an undue burden on a woman's right to seek an abortion during these periods of her pregnancy.[91] An increase in cost, the risk of delay, a limit on a physician's discretion, and particularly burdensome effects do not necessarily place an undue burden on the right to have an abortion.[92] These effects must amount to substantial obstacles before the restrictions will be invalidated.[93]

¶ 40 The evidence in this case is insufficient to show that the restrictions place an undue burden on a woman's right to abortion. In striking down a spousal notification requirement in *Casey*, the Court relied on evidence that the requirement would allow "the husband to wield an effective veto over his wife's decision." [94] There is no evidence in the present case that Oklahoma's location restrictions on abortion place a substantial obstacle on the right to have an abortion.

¶ 41 In *A Woman's Choice–East Side Women's Clinic v. Newman*,[95] the court addressed the proof necessary to successfully challenge an "abortion restriction under the undue burden test." [96] The court noted "that the evidence of a law's likely effects may be so strong that the 'undue burden' for a significant fraction of women will be evident enough even before the law takes effect." [97]

¶ 42 In *Casey*, the United States Supreme Court upheld an informed consent requirement based on the lack of evidence in the record that the requirement "would amount in practical terms to a substantial obstacle to a woman seeking an abortion." [98] The Court also noted: "While at some point increased cost could become a substantial obstacle, there is no such showing on the record before us." [99] The defendants in the present case have not presented any evidence that Oklahoma's restrictions will amount to a substantial obstacle to a woman seeking an abortion. While at some point the negative impact of sections 1–731 and 1–737 may become a substantial obstacle, there is no evidence of such on the record before this Court.

¶ 43 The defendants urge that the decision in *Akron* controls the present case. The *Casey* decision addressed some of the issues raised in *Akron* and explicitly overruled parts of the *Akron* decision although it did not address the requirement that second-

86. Okla.Stat. tit. 63, § 1–737 (1991).

87. *Id.* at § 1–731.

88. *Id.* at § 1–732(C).

89. 505 U.S. at 860, 112 S.Ct. at 2811.

90. 838 P.2d at 7.

91. 505 U.S. at 887, 112 S.Ct. at 2825.

92. *Id.* at 886, 112 S.Ct. at 2825.

93. *Id.*

94. *Id.* at 897, 112 S.Ct. at 2830.

95. 904 F.Supp. 1434 (S.D.Ind.1995).

96. *Id.* at 1448.

97. *Id.*

98. *Casey*, 505 U.S. at 884, 112 S.Ct. at 2824.

99. *Id.* at 901, 112 S.Ct. at 2832.

trimester abortions be performed in hospitals. The United Supreme Court in *Casey* rejected the rigid standard of review endorsed in *Roe* and on which the *Akron* decision was based. After a review of the *Casey* decision and subsequent decisions, we disagree that *Akron* retains its validity. For these reasons, the *Casey* decision, not the decision in *Akron,* controls the present case.

## X. Conclusion

¶ 44 In 1979, the Board promulgated standards regarding the licensure of abortion facilities. The application for a writ of mandamus to require the Board and its members to promulgate standards is moot. Thus, we need not address whether the individual members are proper parties to this action. The district court correctly dismissed the individual members of the Board. Further the district court correctly refused to issue a writ of mandamus against the Board because it is has promulgated standards regarding abortion facilities as requested in the application.

¶ 45 The Commissioner is charged with enforcement and has refused to enforce regulations regarding abortion facilities based on opinions of the Oklahoma Attorney General that the underlying statutes, sections 1–731 and 1–737 of title 63, are unconstitutional. On the record before us, we find that sections 1–731 and 1–737 are not invalid. Mandamus is proper against the Commissioner to require that he enforce these statutory provisions subject to his prosecutorial discretion.

JUDGEMENT OF DISTRICT COURT AFFIRMED IN PART AND REVERSED IN PART; WRIT OF MANDAMUS IS GRANTED AGAINST COMMISSIONER

1.  505 U.S. 833, 884, 112 S.Ct. 2791, 2824, 120 L.Ed.2d 674 (1992).

2.  63 O.S.1991 §§ 1–731 and 1–737.

3.  *Mazurek v. Armstrong,* —— U.S. ——, —— ——, 117 S.Ct. 1865, 1867–68, 138 L.Ed.2d 162 (1997); *Planned Parenthood of Southeastern Pennsylvania v. Casey,* 505 U.S. 833, 884–886, 901, 112 S.Ct. 2791, 2824–2825, 2832, 120 L.Ed.2d 674 (1992); *A Woman's Choice–East*

OF OKLAHOMA STATE BOARD OF HEALTH.

¶ 46 HODGES, LAVENDER, HARGRAVE, OPALA and WATT, JJ., concur.

¶ 47 KAUGER, C.J., and SUMMERS, V.C.J., concur in result.

¶ 48 WILSON, J., concurs in part, dissents in part.

¶ 49 SIMMS, J., dissents.

KAUGER, Chief Justice, concurring in result, with whom OPALA, J., joins:

The challengers/appellees have failed to present any credible evidence that requiring abortions to be performed in a hospital after the first trimester is cost prohibitive, causes an undue burden and amounts to "a substantial obstacle to a woman seeking an abortion" under *Planned Parenthood of Southeastern Pennsylvania v. Casey.*[1] Without any evidence in the record before this Court, a determination that the statutes[2] are invalid may not be based on speculation.[3] Based on the facts—and the lack thereof—before us, I concur in the result of the majority's opinion.

## SUPPLEMENTAL OPINION ON REHEARING

OPALA, Justice.

■ By their *joint* rehearing petition the parties inform the court of having "inadvertently ... caused confusion ..." by their *failure to stress* that the Board of Health rules and regulations, promulgated in 1979 under the authority conferred by the provisions of 63 O.S. 1991 § 1–737[1], have lost

*Side Women's Clinic v. Newman,* 904 F.Supp. 1434, 1448 (S.D.Ind.1995).

1.  The provisions of 63 O.S. 1991 § 1–737 are:
    "An abortion otherwise permitted by law shall be performed only in a hospital, as defined in this article, which meets standards set by the Department. The Department shall develop and promulgate reasonable standards relating to abortions." [Emphasis mine]

their efficacy (lapsed) in 1991. The joint plea urges that the court's opinion be modified by (1) setting aside the *nisi prius* dismissal of the Board of Health members from participation in the suit as parties defendant below and (2) remanding this cause to the trial court for an order directing the Board of Health commissioners to "promulgate rules and regulations governing abortion facilities pursuant to [the provisions of] 63 O.S. [1991] § 1–737."

We *modify* the court's opinion herein by *adding* to its text that this cause stands remanded (a) for an inquiry into the parties' claim that the 1979 regulations became ineffective in 1991; and, if it be found that their force did indeed lapse, then for (b) consideration of the plaintiffs' plea that the Board of Health members be reinstated as parties defendant below; and (c) issuance of a writ directing the Board of Health commissioners to promulgate and enforce such rules and regulations as will implement, and be consistent with, this court's opinion herein. See *Sooner Federal Sav. & Loan Ass'n v. Mobley* 1981 OK 124, 645 P.2d 1000, 1003 (supplemental opinion on rehearing by Lavender, J.)

Rehearing is granted; opinion supplemented; except as modified herein, the court's earlier opinion will stand unaltered.

KAUGER, C.J., and SUMMERS, V.C.J., HODGES, LAVENDER, HARGRAVE, ALMA WILSON and WATT, JJ., concur.

SIMMS, J., dissents.