2002 OK CR 4

**Ryan Owen McCARTY, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

No. F–1999–1599.

Court of Criminal Appeals of Oklahoma.

Feb. 5, 2002.

27. 1995 OK 58, 903 P.2d 288.

Jack McCurdy, Yukon, OK, Attorney for Defendant at trial.

Gary McCurdy, Assistant District Attorney, Canadian County, El Reno, OK, Attorney for the State at trial.

Katherine Jane Allen, Appellate Defender, Oklahoma Indigent Defense System, Norman, OK, Attorney for Appellant on appeal.

W.A. Drew Edmondson, Attorney General, Kellye Bates, Asst. Attorney General, Oklahoma City, OK, Attorneys for Appellee on appeal.

## SUMMARY OPINION

JOHNSON, Vice Presiding Judge.

¶1 Appellant, Ryan Owen McCarty, was convicted by a jury of three counts of First Degree Murder, in violation of 21 O.S.Supp. 1998, § 701.7, in the District Court of Canadian County, Case No. CF 98–518. Following the verdicts, the Honorable Edward C. Cunningham, District Judge, sentenced Appellant to life imprisonment on each count and ordered the sentences to be served concurrently. From the Judgment and Sentences imposed, Appellant filed this appeal.

¶2 Appellant raised the following propositions of error:

1. The evidence presented at trial was insufficient to sustain the convictions under the requirements of the fourteenth Amendment of the United States Constitution and under Article II, § 9 of the Oklahoma Constitution because the State presented insufficient independent evidence to corroborate the confessions of the Appellant;

2. The evidence presented by the State was insufficient to support the jury's verdict that Mr. McCarty was guilty of first degree Murder of Ms. Chisholm's unborn fetus;

3. Mr. McCarty was deprived of effective assistance of counsel in violation of the sixth and fourteenth amendments to the United States Constitution and Article II, §§ 7 and 20 of the Oklahoma Constitution;

4. The trial judge abused his discretion in defining viability in the manner chosen during Mr. McCarty's trial, thus violating Appellant's fourteenth Amendment rights to the United States Constitution and Article II, § 20 of the Oklahoma Constitution. Moreover, there is a void in both the statutes and uniform jury instructions regarding viability, thus necessitating this Court to properly define viability of a fetus;

5. Mr. McCarty's rights to due process and a fair trial under the sixth and fourteenth Amendments to the United States Constitution and corresponding provisions of the Oklahoma constitution were violated by the admission of highly prejudicial and inflammatory color photographs; and,

6. The accumulation of errors deprived Mr. McCarty of a fair trial.

¶3 After thorough consideration of the entire record before us on appeal, including the original record, transcripts, briefs and exhibits of the parties, we have determined that relief is required on Appellant's second proposition of error for the reasons set forth below.

¶4 A state's interest in protecting fetal survival becomes compelling at viability. *Spencer by and through Spencer v. Seikel,* 1987 OK 75, ¶17, 742 P.2d 1126. The determination of viability is a key issue when the State alleges a defendant has committed the murder of an unborn child. *Id.* at ¶18, 742 P.2d at 1130; *see also Hughes v. State,* 1994 OK CR 3, ¶4, 868 P.2d 730, 731 ("an unborn fetus that was viable at the time of injury is a 'human being' which may be the subject of a homicide....."). Viability measures the ability of a fetus to sustain life outside the mother's womb. *Evans v. Olson,* 1976 OK 64, ¶10, f. 3, 550 P.2d 924, 928.

¶5 In the Oklahoma statutes regulating abortion, *see* 63 O.S.Supp.1998, §§ 1–730—1–734, "viable" is defined as "potentially able to live outside of the womb of the mother upon premature birth, whether resulting from natural causes or an abortion." 63 O.S.Supp. 1998, § 1–730(3).[1] Also within these statutes, there is set forth a *rebuttable presumption* that "[a]n unborn child shall be presumed to be viable if more than twenty-four (24) weeks have elapsed since the probable beginning of the last menstrual period of the pregnant woman...." 63 O.S.Supp.1998, § 1–732(B); *see also Davis v. Fieker,* 1997 OK 156, ¶15, f. 19, 952 P.2d 505, 509 ("Viability of the fetus is possible 24 weeks after a woman's last normal menstrual period." *citing* Ralph C. Benson, M.D., HANDBOOK OF OBSTETRICS AND GYNECOLOGY 65, 81 (1992)).

¶6 The Oklahoma legislature has drawn a firm line as to intent with regard to imposing

---

1. This Court interprets the language "potentially able to live outside of the womb of the mother" to be without limitation and to therefore include those situations where the child needs medical assistance to live outside of the womb.

criminal liability for the death of a viable fetus. *See* 63 O.S.1991 § 1–731 (criminalizing certain abortions in Oklahoma); 63 O.S. 1991, § 1–732 (creating rebuttable presumption of viability at 24 weeks); and, 63 O.S. 1991, § 1–732(E) (providing that any person who performs or induces an abortion once a fetus has attained viability is guilty of homicide). *Also see* 21 O.S.1991, § 713. The legislature was clear and without reservation as to a "quick child". This statute provides the willful killing of an unborn quick child is manslaughter in the first degree.

¶ 7 These statutes emphasize that before criminal liability for homicide of a fetus may be imposed, there must be a showing that the fetus was viable and potentially able to live outside of the womb of the mother, and the presumption of viability begins with a showing the fetus had attained a gestational age of 24 weeks.

¶ 8 Therefore (1) when the fetus has not attained viability and/or is less than 24 weeks gestation, a charge of first degree murder is not appropriate; (2) when the unborn child is not viable and/or is less than 24 weeks, but evidence shows the unborn child is "quick" within the mother's womb, liability may be imposed for manslaughter in the first degree (*see* 21 O.S.1991, § 713); and (3) when the unborn child has reached 24 weeks gestation and *medical testimony* shows the unborn child is viable, then the charge should be First Degree Murder, in violation of 21 O.S.Supp.1998 § 701.7.

¶ 9 A criminal charge will not stand for causing the death of an unborn child who is not yet quick within its mother's womb.[2] In most cases, this information should be available to the State at the time the charge is filed; however, we recognize that in some cases, whether the child is "quick," whether the child has attained a gestational age of 24 weeks, and/or whether the child is viable may be questions of fact to be submitted to the jury.

¶ 10 At trial, two witnesses testified as to the gestational age of Ms. Chisholm's fetus. The physician attending her pregnancy testified the fetus was "around 22 weeks" gestation; the medical examiner testified the fetus was "approximately 22 to 23 weeks." The medical examiner testified the survival rate would be "very low" for such an underdeveloped fetus and gave the fetus a 10% to 20% chance of survival even with extensive medical care. The medical examiner looked up the "survivability rate" for a fetus in a medical textbook; he admitted that the book only contained survivability rates for fetuses beginning at 24 weeks and that he "made a slight extrapolation" to arrive at the survivability of a 22 week fetus.

¶ 11 The testimony and evidence, viewed in a light most favorable to the State, does not establish Ms. Chisholm's fetus was viable at the time of Ms. Chisholm's death or that it even was "presumptively viable" (having attained the gestational age of 24 weeks), and we therefore cannot sustain Appellant's conviction for first degree Murder of the unborn fetus in Count III. However, the evidence was sufficient to show beyond a reasonable doubt that Chisholm was carrying a living fetus up to the time of her death, and the fetus had matured beyond 14–15 weeks gestation. This evidence would support a conviction for Death of a Quick Child, which is manslaughter under 21 O.S.Supp.2000, § 713.[3] Accordingly, under the facts pre-

---

2. Although "quick child" is not defined by statute, the term is generally defined as a fetus that has so developed as to move within the mother's womb. *See* Black's Law Dictionary 1415 (4th ed.1968)

3. Relying on *Tarver v. State*, 1982 OK CR 156, 651 P.2d 1332, the dissent submits a conviction under 21 O.S.1991, § 713 cannot be sustained without showing the defendant knew the woman against whom he acted was pregnant. In *Tarver*, the Court held § 713 did not require the defendant to have a specific intent to kill, but then went on to say the State must prove the defendant committed his act "with the awareness that the death of the unborn quick child would likely result." Such awareness is not required by the statutory language of § 713, and is not an essential element of the crime. To that extent, we believe that the language was dicta and that *Tarver* should be, and hereby is, overruled.

Knowledge the woman was pregnant is a necessary element for a first degree manslaughter conviction under 21 O.S.1991, § 714, which provides that "[e]very person ... who uses or employs any instrument *or other means with the intent thereby to destroy such child* ... is guilty in case the death of the child ... is thereby produced, of manslaughter in the first degree." (emphasis added).

sented here, we **FIND** Appellant's conviction for first degree Murder in Count III should be and is hereby **MODIFIED** to first degree Manslaughter, for causing the death of a quick child, and hereby **MODIFY** Appellant's sentence in Count III to twenty (20) years imprisonment.

¶ 12 Proposition one does not warrant relief. Substantial independent evidence corroborated Appellant's confessions, and the evidence was sufficient to sustain the convictions for first degree Murder on Counts I and II. *Spuehler v. State,* 1985 OK CR 132, ¶ 7, 709 P.2d 202, 203–204; *Tilley v. State,* 1998 OK CR 43, ¶ 14, 963 P.2d 607, 612.

¶ 13 No relief on Appellant's third proposition of error is required, as the claim addressed counsel's performance in his defense against Count III, and we have ordered Appellant's conviction in Count III modified. We further decline to grant relief on Appellant's fourth proposition of error and decline to adopt and define viability for purposes of establishing a uniform jury instruction. The trial court did not abuse its discretion in its definition of viability and the instructions, as a whole, fairly and accurately stated the law. *Omalza v. State,* 1995 OK CR 80, ¶ 52, 911 P.2d 286, 303.

¶ 14 Lastly, we find the admission of State's Exhibit 26 was error. The photograph of the unborn fetus, extracted from its mother's body post-mortem, was not relevant on the issue of viability; the photograph was misleading, and was highly inflammatory and prejudicial. 12 O.S.1991, § 2403. As we have modified Appellant's conviction and sentence on Count III, no further relief is required. The other complained of photographs were properly admitted. *Le v. State,* 1997 OK CR 55, ¶ 25, 947 P.2d 535, 548, *cert. denied,* 524 U.S. 930, 118 S.Ct. 2329, 141 L.Ed.2d 702 (1998).

### Decision

¶ 15 The Judgment and Sentences imposed in Counts I and II are **AFFIRMED.** Count III is hereby **MODIFIED** to Manslaughter

in the first degree, and the sentence in Count III is **MODIFIED** to twenty years imprisonment.

LUMPKIN, P.J.: concurs in results.

CHAPEL, J.: concurs in part/dissents in part.

STRUBHAR, J.: concurs in part/dissents in part.

LILE, J.: specially concurs.

LUMPKIN, Presiding Judge: Concur in Result.

¶ 1 I concur in the results reached by the Court in this opinion. However, I have concern regarding some of the analysis.

¶ 2 It is undeniable that science and medicine have progressed greatly since the institution of most of the preambles to our criminal statutes. *See Nealis v. Baird,* 996 P.2d 438 (Okl.1999); *Hughes v. State,* 868 P.2d 730 (Okl.Cr.1994). As the Court's opinion recognizes, this evolution is continuous and cannot be tethered to a finite standard of review as to the protection of life within our society. We recognized in *Hughes* that 21 O.S.1981, § 691, "was enacted in an effort to protect human life". *Id.* at 734. In addition, the Court stated

Our decision that this protection extends to viable human fetuses is clearly in accord with legislative intent. Moreover, in light of the civil liability which can be imposed under Oklahoma law for the wrongful death of a viable human fetus, it would be most unjust to refuse to extend protection to a viable human fetus under Oklahoma's general homicide statute. (internal cites omitted)

*Id.*

¶ 3 We recognized in *Hughes* that "a viable human fetus is nothing less than human life". *Id.* Citing to the Massachusetts case of *Commonwealth v. Cass,* 392 Mass. 799, 467 N.E.2d 1324 (1984), we adopted the language

In prosecutions where the State seeks to impose criminal liability for causing the death of an unborn quick child, by committing a willful act against the mother, a prosecution under either statute is proper and which statute the State elects to proceed under will depend upon the

extent of the defendant's specific intent. To give meaning to both statutes, we believe the legislature intended § 713 to cover those situations in which the State could not show knowledge of the pregnancy and the specific intent to destroy the child.

that "[a]n offspring of human parents cannot reasonably be considered to be other than a human being ... first within, and then in normal course outside, the womb". *Id.* at 1325. The decision in *Hughes* overrules prior caselaw that held a viable fetus is not a "person" within the meaning of 21 O.S.1981, § 652.

¶ 4 Too often Courts, and sometimes individuals, use the word "fetus" as some type of generic reference to a non-entity. Etymology of the word reveals "middle English, from Latin, act of bearing young, offspring; akin to Latin *fetus* newlyd fruitful." And, in further application, "an unborn or unhatched vertebrate, especially after obtaining the basic structural plan of its kind; developing human from usually three months after conception to birth." *See Merriam Webster's Collegiate Dictionary.*

¶ 5 While I concur in the results this Court reaches in this case based on application of statutory language, at the same time I recognize the Court has created three stages in the progression from conception to birth. The first stage is itself the act of conception, which is not addressed or discussed as a part of the resolution of the issues raised in this case. The second phase is the one created by the Court's opinion in its resolution of the issues before the Court at this time. That is, the status of a child being "quick" under the provisions of the legislative language contained in 21 O.S.1991, § 713. And, the third phase is that of the viable child who, on attaining the status of viability, is considered under the law at this time as a "human being".

¶ 6 Under the Court's action today in creating the second phase pursuant to the correct interpretation of the statutory language in Section 713, we have a "quick" child. And, the evidence presented in this case could lead a finder of fact to determine either that the child was or was not viable. Thus, under Oklahoma law, a "quick" nonviable child is still a human being for purposes of the application of the provisions of Section 713, pursuant to the statutory language.

¶ 7 I find the Court's almost hypnotic focus on the provisions of 63 O.S.Supp.1998, § 1–732(B), as it relates to the twenty-four-week period described in the statute, as giving that statute more meaning than it deserves. That statute only creates a rebuttable presumption that "[a]n unborn child shall be presumed to be viable if more than twenty-four (24) weeks have elapsed since the probable beginning of the last menstrual period of a pregnant woman...." A rebuttable presumption is one that can be rebutted both for and against viability at a lesser period of weeks.[1] As stated previously, the Oklahoma Supreme Court in *Nealis v. Baird* and this Court in *Hughes v. State*, have recognized the almost daily progressions in medical science, which continues to move back the time when an unborn child is viable outside the womb. As our decision in *Hughes* stated, "an unborn fetus that was viable at the time of injury is a 'human being' which may be the subject of a homicide under 21 O.S.1981, § 691 ('homicide is the killing of one human being by another')." Therefore, if medical science tomorrow stated that an eighteen-week, or sixteen-week, or fourteen-week unborn child was viable inside the womb, and died as a result of actions by a defendant which constituted the elements of any level of homicide, then that defendant could be prosecuted and a conviction sustained upon the evidence for the level of homicide warranted by the elements proved. Thus, the law is determining that in our society, there is liability for the taking of the life of an unborn child and that liability arises upon a determination of the viability of that unborn child. As medical science continues to improve and viability comes at earlier and earlier stages of the birth process, individuals should be, and will be, put on notice that their acts which lead to the death of that unborn child, once the child has attained that level of viability as determined by the medical evidence, can, and will, make them liable for the taking of the life of that unborn child.

¶ 8 In addition to that liability for the death of an unborn viable child, the Court in this opinion correctly finds that the Okla-

---

1. It is not necessary to render further discussion at this time, however, any presumption in the application to criminal liability must meet the requirements of *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979)

homa Legislature has also carved out the additional liability of a defendant who causes the death of an unborn child who may not have reached the state of medical viability but, under the statute is a "quick" child. That is well within the prerogative of the Legislature and it is appropriate this Court should enforce that prerogative through this decision. As our Legislature has stated in 21 O.S.1991, § 691, "homicide is the killing of one human being by another". Therefore, in each of these instances, we are talking about the taking of the life of a human being as defined by the Legislature. Whether that individual be a child just born, a mature adult, a viable unborn child, or a quick unborn child, our statutes were enacted in an effort to protect human life as defined by the Oklahoma Legislature. Due to that fact, I propose it is more appropriate to refer to the stages of protected human life with the appropriate words, i.e., unborn viable child, unborn quick child, rather than the generic term which seems to dehumanize the issue before us, i.e., fetus.

¶ 9 Under the facts of this case, I find the jury, as trier of fact in this case, could have interpreted and applied the evidence to find this was a viable unborn child and believe the evidence supports affirming the conviction for murder, first degree, in Count III. However, due to the Court's adoption of the interpretation of the statutory language in 21 O.S.Supp.2000, § 713, relating to the liability of an individual for the taking of the life of a nonviable, but quick child, I join in the results reached by this Court.

CHAPEL, J., Concurring in Part, Dissenting in Part.

¶ 1 I concur in part and dissent in part. First, I concur in affirming the First Degree Murder convictions and sentences in Counts I and II. I also agree that we must reverse McCarty's first-degree murder conviction for the death of the unborn fetus (Count III). However, I write separately to explain my reasoning as I believe we should be very clear in setting forth our resolution of the issue of viability. In *Hughes v. State*,[1] this Court abandoned the "born alive" rule and determined that an unborn fetus, viable at the time of injury, is a human being and may be the subject of a homicide prosecution. In order to sustain a prosecution for first-degree murder, the State must show the unborn child was viable. I agree with the majority's conclusion that "viable" means the fetus is able to live separately and apart from the mother, with or without artificial aid.[2] Following *Hughes*, we continue to use a strict viability standard to determine criminal culpability. The Oklahoma abortion statutes create a rebuttable presumption that a fetus is viable at 24 weeks.[3] As a presumption, however, it may be overcome by evidence showing, for example, that 26–week-old in utero twins are not developed enough to survive for any significant time outside the uterus, or by showing that a 22–week-old fetus is viable. In either case, the question is whether the fetus is capable of survival after birth. I agree with the majority that no evidence was presented suggesting the 22–week-old fetus here was viable. As there

1. 1994 OK CR 3, 868 P.2d 730, 731. The Oklahoma Supreme Court earlier ruled there was a cause of action under the wrongful death statute for the death of a viable unborn child. *Evans v. Olson*, 1976 OK 64, 550 P.2d 924, 925.

2. *Thornburgh v. American College of Obstetricians and Gynecologists*, 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986); *Roe v. Wade*, 410 U.S. 113, 160, 93 S.Ct. 705, 730, 35 L.Ed.2d 147 (1973). Oklahoma case law regarding the meaning of "viable" is ambiguous. Without explicitly defining the term, this Court has cited a South Carolina case which defined "viable" as living without artificial aid. *Hughes*, 868 P.2d at 733 (without the aid of artificial support). The Oklahoma Supreme Court has cited definitions which provide for artificial support. *Spencer v. Seikel*, 1987 OK 75, 742 P.2d 1126, 1130 (sustained survival outside the womb, with or without artifi-

cial support). The Oklahoma Supreme Court has also referred to viability as the capacity to live outside the uterus without determining whether the fetus must survive unaided. *Nealis v. Baird*, 1999 OK 98, 996 P.2d 438, 447 (the moment when the unborn child can survive independently of its mother); *Davis v. Fieker*, 1997 OK 156, 952 P.2d 505, 509 n. 17 (citing the American Heritage dictionary definition "live and develop outside the womb"); *Evans*, 550 P.2d at 928, n. 3 (citing Webster's dictionary definition of "living outside the uterus"). Black's defines fetal viability as life which continues "indefinitely outside the womb by natural or artificial life-supportive systems." Black's Law Dictionary 1404 (5th Ed.).

3. 63 O.S.Supp.1998, § 1–732(B) ("if more than 24 weeks have elapsed since the probable beginning of the last menstrual period").

was nothing to suggest the fetus could sustain life outside the womb, and it was 22 weeks old, the State failed to rebut the presumption that the fetus was not viable. I therefore agree with the majority that McCarty's conviction for first degree murder cannot stand.

¶ 2 The opinion then turns to Section 713,[4] a statute providing that the "willful killing of an unborn quick child by any injury committed upon the person of the mother" is first degree manslaughter. The majority applies this statute to the facts before us. In doing so, this Court once again creates a special category of general intent homicide.[5] As I set forth below, I do not believe Section 713 can be applied in this case. I therefore dissent to the portion of the opinion modifying McCarty's conviction to one of first degree manslaughter under Section 713.

¶ 3 The early Oklahoma legislature adopted Section 713 from the Dakota Territory penal code. Section 713 was originally part of a series of statutes designed to prohibit abortion, although no published cases show any prosecutions for that reason.[6] In my view, this statute no longer has anything to do with the constitutionally protected right to abortion. It expresses the legislative intent to punish as criminal a homicidal attack on an unborn child. The State has a vital interest in protecting the lives of unborn children, and in punishing those who would injure them. In *Hughes* we cited Section 713 as allowing for the punishment of one who commits violence against a pregnant woman and destroys the fetus within her.[7] In fact, without Section 713, there would be no protection for quick, nonviable unborn children.

¶ 4 Section 713 prohibits the willful killing of an unborn quick child. The word "quick" is not as easy to define as it seems. Research shows that fetal homicide discussions refer to "quick", "quick with child", and "quickening", often apparently interchangeably. As the majority notes, "quick child", while not defined by statute, is defined in Black's Law Dictionary as "able to move within the womb."[8] The Sloane Dorland medical dictionary defines "quick child" as a fetus with discernible movement so far developed and matured as to be able to survive the trauma of birth with the aid of medical care—the characteristics we use to define a viable fetus.[9] Sloane Dorland also defines "quick" as "pregnant and able to feel the fetal movements," and notes that a fetus normally becomes "quick" at about four and a half months.[10] Several recent medical dictionaries define "quick" as pregnant and able to feel fetal movement, "quickening" as the first recognizable fetal movement, and have no definition for "quick child".[11] "Quickening" is generally used to denote the first motion of the fetus in the womb felt by the mother.[12] "Quick with child" as a legal term

4. 21 O.S.1991, § 713.

5. *See, e.g., Fairchild v. State,* 1999 OK CR 49, 998 P.2d 611, *cert. denied,* 532 U.S. 1039, 121 S.Ct. 2002, 149 L.Ed.2d 1004 (2001) (first degree child abuse murder is general intent crime). The Court appears to be creating a special category of homicide: any killing of a child or fetus may be punished without regard to intent.

6. The Dakota statutes originally indexed these crimes under "Abortion". Compiled Laws of the Territory of Dakota, 1289 (1887). Pinzel, *Henrie v. Derryberry and the Current Status of the Oklahoma Abortion Laws,* 10 Tulsa Law Journal 273 (1974) (discussing a decision under the companion statute, Section 714, which punished as manslaughter prescribing, procuring, or administering any substance to a pregnant woman with the intent to destroy the child).

7. *Hughes,* 868 P.2d at 733 n. 3.

8. Black's Law Dictionary 1247 (6th Ed.)

9. Sloane–Dorland Annotated Medical–Legal Dictionary 597 (1987). Following the Sloane Dor-

land definition, the Rhode Island legislature has defined "quick child" as one so far developed and matured as to be able to survive the trauma of birth with the aid of medical care. R.I.Gen. Laws Ann. § 11–23–5, ¶ 3.

10. *Id.*

11. Taber's Cyclopedic Medical Dictionary 1618 (18th Ed.1997) (estimating "quickening" occurs from 18th to 20th week of pregnancy, but noting it may be as early as 10th week); Stedman's Medical Dictionary 1479 (26th Ed.1995) (estimating "quickening" occurs from 16th to 20th week of pregnancy); Dorland's Illustrated Medical Dictionary 1399 (28th Ed.1994) (estimating "quickening" occurs from 16th to 20th week of pregnancy).

12. Black's Law Dictionary 1247 (6th Ed.); Webster's New Explorer Medical Dictionary 579 (1999); Dorland's Illustrated Medical Dictionary 1399 (28th Ed.1994); Sloane–Dorland Annotated Medical–Legal Dictionary 597–98 (1987) (from 16th to 18th week of pregnancy); American Med-

means "having conceived".[13] However, its earliest use was to mean the state of pregnancy in which the movement of the fetus was felt—i.e., quickening.[14]

¶ 5 When Section 713 was first adopted in the late nineteenth century, "quick child" and "quickening" were, for all practical purposes, the same thing. The only reliable way to tell whether a fetus was capable of movement in the womb was by waiting until the mother felt it move. As this usually happens between 16 and 20 weeks into a pregnancy, by the time a child was "quick" enough for movement to be felt, it was already relatively close to our modern parameters of viability. Technology has advanced to the point where we can determine movement in the womb well before the mother feels movement. Many pregnant women who have sonograms at 11 to 15 weeks are amazed at the sight of the fetus kicking, swimming and jumping, often vigorously, even though they have felt no sensation of movement. For this reason, while the definition of "quick"—whatever that is—may not have changed since Section 713 was adopted, its practical meaning is very different. Taking the most common definition, that a quick child is one capable of movement within the womb, we leave open the possibility that Section 713 applies to the killing of a fetus as early as eleven weeks, if that fetus is proved to be capable of movement.[15]

¶ 6 In order to resolve the issue of the applicability of Section 713 when a fetus is "quick", we look at the remaining language. The statute's first requirement is that the killing be willful. The penal code defines "willfully" as "simply a purpose or willingness to commit the act or the omission referred to", without any intent to injure another.[16] However, the act or omission referred to in Section 713 is an act resulting in the killing of an unborn quick child by injury to its mother. In *Tarver v. State*,[17] we determined the element, "willful killing of an unborn quick child," refers to the perpetrator's subjective state of mind, and requires that he injure the mother with the awareness that the death of an unborn quick child is likely to result. The statute requires no specific intent to kill the unborn child, but the attacker must be aware that such a result could ensue. This necessarily implies that the perpetrator knows that the woman he is attacking is pregnant.[18] Such knowledge could be proven by direct or circumstantial evidence. Section 713 cannot apply unless the defendant knows of the existence of the unborn child.[19]

ical Association Encyclopedia of Medicine 842 (1989) (from 16th to 20th week of pregnancy); Melloni's Illustrated Medical Dictionary 401 (1979) (about fourth or fifth month of pregnancy); Oxford English Dictionary Vol. XIII 19 (2nd Edition 1989) ("quicken" defined as the stage of pregnancy at which the child shows signs of life; "quickening" defined as first sensation of movement of the fetus). However, one author suggests that early common law held quickening occurred between the sixth and eighth week of pregnancy. Wasserstrom, *Homicide Based on Killing of Unborn Child*, 64 ALR 5th 671, 686, 1998 WL 1032152.

13. Black's Law Dictionary 1247 (6th Ed.)

14. Oxford English Dictionary Vol XIII 14 (2nd Edition 1989) (use first noted in 1450).

15. See *Brinkley v. State*, 253 Ga. 541, 322 S.E.2d 49 (1984) (terms "quick" and "unborn child" not void for vagueness using common-law definitions, where mother told defendant she was pregnant, fetus was 16 weeks old, and mother had already felt fetal movement). The Eleventh Circuit later found the Georgia statute did not violate this defendant's equal protection rights. *Smith v. Newsome*, 815 F.2d 1386 (11 Cir.1987).

16. 21 O.S.1991, § 92.

17. 1982 OK CR 156, 651 P.2d 1332, 1334–5. My conclusion that *Tarver* requires no specific intent to kill but does mandate awareness of the pregnancy, does not conflict with the Court's analysis of general and specific intent in *Fairchild v. State*, 1999 OK CR 49, 998 P.2d 611.

18. In *Tarver*, the defendant was aware that the mother (his wife) was eight months pregnant. In *Burrows v. State*, 1982 OK CR 6, 640 P.2d 533, 539, cert. denied, 460 U.S. 1011, 103 S.Ct. 1250, 75 L.Ed.2d 480, we held a defendant could not subsequently be prosecuted under Section 713 where evidence the victim (his wife) was 7 ½ months pregnant was introduced in the first stage of his capital trial for her murder. In *Hooks v. State*, 1993 OK CR 41, 862 P.2d 1273, cert. denied, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 490, the defendant was aware that the victim (his girlfriend) was 24 weeks pregnant with his child.

19. This awareness requirement does not conflict with the Oklahoma Supreme Court's conclusion in *Nealis* that a nonviable fetus born alive is a person. *Nealis*, 996 P.2d at 453–54. *Nealis*, a

¶ 7 Recognizing the inescapable conclusion that § 713 as interpreted in *Tarver* cannot support a conviction in this case, the majority, in a footnote, overrules *Tarver*. Without analysis, the majority concludes that § 713 does not require a defendant know the woman against whom he acts is pregnant. Instead, the majority suggests the companion abortion statute, § 714, provides an intent requirement for prosecutions for the intentional death of an unborn quick child. This completely disregards both the statutory history and case law surrounding the statutes and the language of § 714 itself. That statute prohibits as manslaughter any person from administering, prescribing, advising a woman or procuring a substance for her, or using any instrument with an intent to destroy an unborn quick child. This contains very different elements from the simple prohibition against killing an unborn child by attacking a pregnant woman found in § 713.

¶ 8 Rather than giving meaning to both statutes, the majority decision renders them meaningless. Under this reading, § 713 refers to a general intent homicide. If, in the course of committing a crime, a defendant attacks a complete stranger whose pregnancy is not immediately apparent by eye, and her fetus dies, the defendant is automatically liable for manslaughter. This does not further the legislative purpose of punishing a homicidal attack on an unborn child. How can it, where the defendant does not know the child exists? Furthermore, the specific nature of § 714 is diluted. The majority states, "which statute the State elects to proceed under will depend upon the extent of the defendant's specific intent." [20] This is the case only if the overall intent of § 714 is disregarded. That statutory language, taken as a whole, refers to ways in which a person advises or assists a woman in destroying a viable fetus—i.e., abortion. By reading one phrase in isolation, the majority renders the remainder of the statute useless.

¶ 9 Other states with statutes similar to § 713 have recognized the knowledge requirement we described in *Tarver*. Nevada and Washington have homicide statutes which, like Oklahoma's, punish the willful killing of an unborn quick child by any injury to the mother.[21] Five other states make an act criminal where the unborn quick child is willfully killed by any injury to the mother which would be murder if it resulted in her death.[22] Arizona prohibits as manslaughter knowingly or recklessly causing the death of an unborn child at any stage by physical injury to the mother which would be murder if the mother were to die.[23] South Dakota prohibits intentionally killing a human fetus by causing injury to its mother.[24] Illinois prohibits "the intentional homicide of an unborn child" where the defendant knows the woman is pregnant.[25] Several jurisdictions have no reported cases under these statutes, or the cases deal with criminal abortion prosecutions. Of the cases involving convictions for homicide of an unborn child, most do not

civil case, sought to determine who was a "person" under the wrongful death statutes. That context is far removed from the question of criminal liability under the various homicide statutes.

**20.** Majority opinion at 984, n. 3.

**21.** Nev. Rev. State. § 200.210; Wash.Rev.Code Ann. § 9A.32.060. There are no reported cases from Nevada construing this statute. The only cases from Washington are old cases charging manslaughter where defendants performed or procured abortions.

**22.** Fla.Stat.Ann. § 782.09; Ga.Code Ann. § 16–5–80; Mich.Comp.Laws Ann. § 750.322; Miss. Code Ann. § 97–3–37; R.I.Gen.Laws Ann. § 11–23–5. Missouri also adopted this statute. Mo. State.Ann.1949 § 559.090. In 1986, Missouri deleted this statute and substituted a general statute defining "unborn child" (life beginning at con-

ception), declaring the rights of unborn children, and applying the statute to all Missouri laws. In combination with the homicide statutes, an unborn child has subsequently been deemed a "person" for both manslaughter, *State v. Knapp*, 843 S.W.2d 345, 347 (Mo.1992), and first degree murder, *State v. Holcomb*, 956 S.W.2d 286, 290 (Mo.App. W.D.1997).

**23.** Ariz.Rev.Stats. § 13.1103(A)(5).

**24.** S.D.Codified Laws § 22–17–6. "Human fetus" is elsewhere defined as any individual homo sapiens from fertilization to live birth. S.D.Codified Laws § 22–1–2(50A). North Dakota, on the other hand, includes as manslaughter recklessly causing the death of an unborn child. N.D.Stats. 1987 ch. 166, § 12.1–17.1–03.

**25.** Ill.Comp.Stats.Ann. ch. 720, § 9–1.2(a)(3), (b). The statute defines "unborn child" as any human from fertilization until birth.

touch on issues of intent. However, as in *Tarver*, courts have held that these types of statutes may require awareness of the pregnancy.[26] In contrast, California has determined that a person may be liable for malice murder of a fetus by injury to the mother at any time after the embryonic stage, or about eight weeks, without being aware that the mother is pregnant.[27] However, the California statute is considerably broader than Section 713, as it requires neither a willful act nor specifies the victim must be an unborn quick child.[28]

¶ 10 This requirement that the defendant have knowledge of the pregnancy separates criminal liability for manslaughter under Section 713 from other homicide statutes, including other manslaughter statutes.[29] The Arizona Supreme Court has noted that the transferred intent doctrine is not available for this crime, as the statute requires a specific finding of the defendant's mental state toward the unborn child.[30] I agree. If you act with malice, intending to kill a particular person, and your action kills a third person you did not intend to harm, you are liable for that person's death.[31] Unlike malice murder, Section 713 does not require any intent to harm any particular person. It does not even require, like other types of homicide, that the perpetrator act recklessly. However, under Section 713 an attacker must know

that the mother of the unborn child is pregnant. That state of mind is specific to the particular unborn child who is the victim of the attack—the attacker must be aware that particular unborn child exists and may be killed as a result of his attack on the mother. Of course, the majority reading turns § 713 into a simple codification of the transferred intent rule. An attack on a mother which results in the unintended death of her unknown unborn child is manslaughter. Again, this cannot serve the legislative purpose of preventing homicidal attacks on unborn children.

¶ 11 A defendant charged under the homicide statutes may also be liable for an unintended homicide if it is charged as felony murder. The willful killing of an unborn quick (but not viable) child is not listed within the enumerated crimes authorizing a felony murder charge.[32]

¶ 12 Applying all the elements of Section 713 to the facts of this case, I agree that evidence supports the finding that Felicia Chisholm's unborn child was a quick child under the statute. However, I find no evidence McCarty knew Ms. Chisholm was pregnant. Indeed, there is no evidence McCarty knew Ms. Chisholm at all or had ever seen her. This tragic murder occurred when McCarty set a fire intended for one set

---

**26.** *People v. Gillespie*, 276 Ill.App.3d 495, 213 Ill.Dec. 382, 659 N.E.2d 12 (1995) (defendant must have knowledge of pregnancy); *Willis v. State*, 518 So.2d 667 (Miss.1988) (evidence showed defendant knew or should have known of pregnancy, as victim was obviously seven months pregnant, and defendant knew her personally); *Brinkley v. State*, 253 Ga. 541, 322 S.E.2d 49 (1984) (discussing whether statute void for vagueness trial court noted mother told defendant she was pregnant, fetus was 16 weeks old, and mother had already felt fetal movement); *State v. Harness*, 280 S.W.2d 11 (Mo.1955) (injury was not capable of causing death to the mother, who was carrying defendant's child); *Passley v. State*, 194 Ga. 327, 21 S.E.2d 230 (1942) (no injury capable of causing death to the mother, where defendant beat her with apparent intent to kill the unborn child). *See also Taylor v. State*, 795 So.2d 512, 2001 WL 723189 (Miss. June 28, 2001) (applies discussion of deliberate design necessary for malice murder to intent requirement for murder of unborn child); *State v. Keller*, 592 So.2d 1365 (La.App. 1 Cir.1991) (first-degree murder upheld where defendant intended to kill both the mother and her unborn child); *State v.*

*McCall*, 458 So.2d 875, 877 (Fla. 2d DCA 1984) (feticide statute does not apply in vehicular homicide case where State did not allege defendant willfully killed the unborn child).

**27.** *People v. Davis*, 7 Cal.4th 797, 30 Cal.Rptr.2d 50, 872 P.2d 591 (1994).

**28.** Cal.Stats.1970, § 187(a).

**29.** Under the majority reading, of course, the statute becomes an expression of legislative intent that one is potentially liable for manslaughter for any attack on a woman of child-bearing age.

**30.** *State v. Amaya–Ruiz*, 166 Ariz. 152, 800 P.2d 1260, 1281, (1990), *cert. denied*, 500 U.S. 929, 111 S.Ct. 2044, 114 L.Ed.2d 129 (1991).

**31.** *Short v. State*, 1999 OK CR 15, 980 P.2d 1081, 1098, *cert. denied*, 528 U.S. 1085, 120 S.Ct. 811, 145 L.Ed.2d 683.

**32.** 21 O.S.Supp.1998, § 701.7(B).

of victims, and killed another. He is certainly liable for the murders of Ms. Chisholm and Mr. LeBleu, but no evidence suggests McCarty willfully killed Ms. Chisholm's unborn quick child. Consequently I cannot agree to modify McCarty's conviction to reflect a conviction under Section 713.

¶ 13 Finally, I would clarify the majority holding setting forth when a prosecution for murder or manslaughter is appropriate. The majority states liability for manslaughter under Section 713 may be imposed where (1) a fetus is not viable and/or is less than 24 weeks in gestation (so first degree murder is not appropriate) and (2) evidence shows the unborn child is quick. *Tarver* also requires that, for liability under Section 713, the defendant is aware the woman is pregnant. The majority then describes eligibility for first degree murder by adding a third category, where the unborn child has reached the 24th week of pregnancy and medical testimony states it is viable. I would clarify this language because in some cases prosecution for first-degree murder would be appropriate where an unborn child is viable even if the pregnancy has not reached 24 weeks, or where the fetus has reached the 24th week of pregnancy and no evidence rebuts the presumption of viability. Following *Hughes*, I would hold that first degree murder charges are appropriate where the unborn child is viable, which may be proved through evidence that the fetus has reached 24 weeks or is capable of life outside the womb, with or without artificial aid.

STRUBHAR, J., Concurring in Part; Dissenting in Part.

¶ 1 I concur in affirming Counts I & II, the First Degree Murder convictions and sentences. I agree that this Court should reverse Count III, the First Degree Murder conviction for the death of the unborn fetus; however, I dissent to the modification of the conviction to First Degree Manslaughter under 21 O.S.1991 § 713. I see no reason to overrule *Tarver v. State*[1] and I would reverse Count III.

[1]. 1982 OK CR 156, 651 P.2d 1332.

LILE, Judge: Specially Concurs.

¶ 1 This is not an abortion case. This is a murder case. The Court begins by citing *Spencer by and through Spencer v. Seikel*, 1987 OK 75, 742 P.2d 1126, a negligence case, for the proposition that "[a] state's interest in protecting fetal survival becomes compelling at viability." *Spencer* drew this conclusion directly from *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147, an abortion case. *Roe* weighed the mother's right to privacy (to elect an abortion) against the state's right to protect potential life (to proscribe abortions) and found that prior to viability the right to privacy was paramount, and at and after viability, the State's interest in prohibiting abortions becomes paramount. The *Roe* Court acknowledged the difficulty of its decision, recognizing that:

> "We need not resolve the difficult question of when life begins. When those trained in the respective disciplines of medicine, philosophy, and theology are unable to arrive at any consensus, the judiciary, at this point in the development of man's knowledge, is not in a position to speculate as to the answer." *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

The Courts, even in abortion cases have recognized that viability presupposes medical assistance. As stated in *Roe*, it is the " . . . point at which the fetus becomes 'viable', that is, potentially able to live outside the mother's womb, albeit with artificial aid." *Id.*

¶ 2 So, even for the purposes of these abortion cases and clearly in the context of homicide, viability means ability to live after delivery, with or without medical treatment.

¶ 3 There are no competing rights to weigh against the state's right to protect potential life in the case of homicide. Appellant obviously has no protected right to kill someone else's unborn infant. The State may prohibit the taking of human life by Homicide from the first spark of that life. Title 21 O.S.1991, § 713, in the absence of a more inclusive statute, answers the question in this case. However, there is no constitutional prohibition on broader, more inclusive legislation that could further protect unborn children

from homicide. Under our current statutes, death of a viable unborn child may be prosecuted as any other homicide case. If the child was not viable, but nevertheless quick, the crime would be manslaughter. The Legislature could constitutionally enact provisions which would protect the life of the unborn, non-quick child from homicide.